Ben **COLEMAN**, Barbara McArthur, and Catherine Sullivan, Plaintiffs,

v.

**WAYNE STATE UNIVERSITY, Defendant.**

No. 85–CV–70191–DT.

United States District Court, E.D. Michigan, S.D.

July 7, 1987.

Naomi Ottison-Truman, Wayne Brown, Law Centers, Inc. of the Pan-African Orthodox Christian Church, Detroit, Mich., for plaintiffs Coleman and McArthur.

Michael Kiley, Office of the General Counsel, Detroit, Mich., for defendant Wayne State University.

Catherine Sullivan, in pro per.

## OPINION

GILMORE, District Judge.

This case unhappily reveals the fight for equal opportunity is no more over in our nation's universities than it is anywhere else in our society.

Plaintiffs, claiming racial discrimination, seek damages and injunctive relief against defendant Wayne State University under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. They claim defendant treated them differently because of their race, and engaged in a pattern of racial discrimination that had an adverse impact on each of them.

Plaintiff Ben Coleman, a black former personnel officer, alleges that the University subjected him to disparate treatment with respect to promotional opportunities, and that University employees retaliated against him for his activities intended to draw attention to problems of racial discrimination at the University.

Plaintiff Barbara McArthur, a black tenured professor in the college of nursing, claims the University has consistently paid her less than white professors in the college as a result of race discrimination.

Plaintiff Catherine Sullivan, a black former assistant professor, alleges disparate treatment in the workplace, denial of tenure, and termination of employment on the basis of her race.

### I

■ At final argument, the Court, on its own motion, raised the question of Eleventh Amendment immunity, particularly as it applied to claims under 42 U.S.C. §§ 1981 and 1983. Where the Eleventh Amendment applies, it constitutes a jurisdictional bar that may be raised at any time. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Defendant's counsel stated his client had instructed him to waive this constitutional defense. This presents the issue of whether Wayne State University can waive Eleventh Amendment immunity.

■ The Eleventh Amendment bars any action against a state or its agencies or instrumentalities, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Claims against a state official on grounds that his actions violate the federal constitution or federal law are excepted. *Ex parte Young* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This exception is inapplicable in the present case since the only named defendant is Wayne State University.

■ Defendant Wayne State University is a state instrumentality, and therefore qualifies for state immunity under the Eleventh Amendment. The University's origins are in the Michigan State Constitution, and its Board of Governors is a constitutional body.[1] There is no reason to distinguish Wayne State University from other Michigan universities whose constitutional status, other courts have held, confers Eleventh Amendment immunity. *Karmanos v. Baker*, 816 F.2d 258, 259 (6th Cir.1987) (University of Michigan); *Ewing v. Board of Regents of the University of Michigan*, 552 F.Supp. 881 (E.D.Mich.1982); *Hutchins v. Board of Trustees of Michigan State University*, 595 F.Supp. 862 (W.D.Mich.1984).

■ Where constitutionally authorized, the United States Congress may abrogate the states' Eleventh Amendment immunity, but this requires a clear showing that this was Congress' intent. *Quern v. Jordan*, 440 U.S. 332, 340, 343, 99 S.Ct. 1139, 1144, 1146, 39 L.Ed.2d 358 (1979).

■ In *Quern v. Jordan*, the Supreme Court, reaffirming prior decisions, held that Congress did not intend to abrogate the Eleventh Amendment immunity of the states when it enacted Section 1983. The Supreme Court has yet to address whether Congress intended Section 1981 to override the states' constitutional immunity. However, in *Freeman v. Michigan Department of State*, 808 F.2d 1174 (6th Cir.1987), the Sixth Circuit held that the Eleventh Amendment barred a Section 1981 claim against a state or state agency as to both the equitable and monetary relief plaintiffs sought.

Since these cases establish there has been no Congressional abrogation of state immunity with respect to claims under Sections 1981 and 1983, the issue narrows to whether defendant's stated waiver is effective. The Court finds it is not.

A state may waive its constitutional immunity, but waiver will be found "[o]nly where stated 'by the most express language, or by such overwhelming implica-

tions from the text as [will] leave no room for any other reasonable construction' ". *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1361; *see also, Freeman, supra; Allinder v. Ohio*, 808 F.2d 1180 (6th Cir.1987).

The Sixth Circuit dealt with this issue in *Ohio v. Madeline Marie Nursing Homes*, 694 F.2d 449, 461 (6th Cir.1982), where the court stated:

> Generally, officers of a state cannot waive its Eleventh Amendment immunity by their mere actions … [I]n *Taylor v. Perini* [503 F.2d 899 (6th Cir.1974) ] … we held that attorney fees could not be awarded against the State of Ohio despite the consent to those fees by the state attorney general in the district court.

More to the point in this case is the Michigan Supreme Court's statement concerning who is authorized to waive the defense of sovereign immunity on behalf of the state:

> The authority to waive such defense is in the legislature and until there is legislative action authorizing an officer or agent of the State to waive such defense, it may not be done by any officer or agent.
>
> … If, as we hold, such defense can only be waived by legislative action, then it necessarily follows that the attorney general, an officer of the State of Michigan, may not waive such defense. Moreover, the failure to plead the defense of sovereign immunity cannot create a cause of action where none existed before.

*McNair v. State Highway Department*, 305 Mich. 181, 187, 9 N.W.2d 52 (1943).

■ Aware of no enactment by the Michigan legislature clearly authorizing the waiver of the University's immunity, the Court holds defendant's counsel's statement in open court did not effectively waive the University's Eleventh Amendment immunity with respect to plaintiffs' claims under 42 U.S.C. §§ 1981, 1983.

A different result obtains, however, with respect to plaintiffs' claims against Wayne State University under Title VII of the

---

1. Mich. Const. Art. 8, Sections 4, 5.

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

In 1972, Congress amended Title VII to bring within its purview "governments, governmental agencies, [and] political subdivisions ...," 42 U.S.C. § 2000e(a), as persons forbidden from subjecting individuals to employment discrimination based on race, color, religion, sex or national origin.

Addressing these amendments in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Supreme Court held the Eleventh Amendment does not bar an award of damages against a state in a Title VII action. The *Fitzpatrick* Court held the 1972 amendments constituted an exercise of Congress's power under Section 5 of the Fourteenth Amendment.

> We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against states or state officials which are constitutionally impermissible in other contexts.

*Id.* at 456, 96 S.Ct. at 2671.

In *Freeman*, the Sixth Circuit, following *Fitzpatrick*, held the district court erred in dismissing on grounds of Eleventh Amendment immunity a Title VII action seeking injunctive relief and money damages against a state agency.

Based on the foregoing discussion, the Court concludes plaintiffs' remedies are limited to those available under Title VII.

## II

Wayne State University is one of the nation's great urban universities. It comprises ten colleges, including a law school and a school of medicine, and is recognized by the National Science Foundation as among the top 100 universities in research in the United States. It serves a relatively older, urban student population. Thirty per cent of its students come from the City of Detroit itself; 95 per cent of its students are from the Detroit Metropolitan area.

David Adamany has been its president since August of 1982. He came to the University with impressive credentials, including undergraduate and law degrees from Harvard, and a doctorate in political science from the University of Wisconsin.

Adamany was a helpful witness. He testified that Wayne State University has the highest percentage of black student population of any major research university in the United States. Twenty-two to 24 per cent of the students are black, and 5 to 6 per cent represent other minorities. The percentage of black faculty members is also well above the average, excepting historically black universities. Seven per cent of the faculty is black, and 8 per cent consists of other minorities, in contrast to a norm of 2 per cent black faculty at other universities. He also testified to the presence of many blacks in mid-management positions at the University. In five of the colleges either a dean, an associate dean, or an assistant dean is black.

Adamany testified persuasively regarding the University's efforts in recruiting black faculty and the difficulties of minority recruitment. Nationwide in 1985, only 1,050 blacks received Ph.D.'s. Of these, more than half received their degree in education, and most of them sought employment in public school systems rather than in higher education. Only about 36 new Ph.D. recipients were engineers, many of whom went into business. Only about 31 of the Ph.D. recipients received their degrees in the hard sciences. Adamany testified that Wayne State University competes for this small pool of candidates along with approximately 1,500 other colleges and universities.

He testified that, in order to deal with this competition, the University established a fund to be used in recruiting black faculty, which, under his direction, has been increased from $50,000 to $200,000 per year. Deans are permitted to supplement salary offers to black faculty recruits by drawing from this fund. In addition, Adamany testified that the University has occasionally created new faculty positions in order to obtain a black faculty member.

The University has also made laudable efforts to recruit black students. It is the

only university in Michigan which identifies, counsels and recruits black high school students via high school visitation. The University supports many black students through their first undergraduate year. The University conducts special programs for minority medical students and special programs to encourage black students to pursue advanced degrees.

The Court is also convinced that the University attempts to be responsive to the needs of the black faculty and students it recruits. The Phylon Society, an organization of black faculty members and administrators, has been active in educating the University to the needs of its minority community, and in insisting that the University responds to those needs. At the urging of the Phylon Society, Adamany substantially revised Executive Order 84(1), which governs the discrimination complaint process at the University. The University also adopted the Phylon Society's proposal for summer grants for black faculty. These grants, available only to black faculty, support summer research efforts and relieve black faculty of the need to teach in the summer, thereby assisting young black faculty in completing research and earning tenure.

However, despite the commendable efforts of the President and Board of Governors, racism has no more been eliminated "root and branch" from Wayne State University than it has from our society as a whole. The Phylon Society reported 32 complaints of racial discrimination in 1985, including complaints from faculty, professional staff, clerical staff, administrators, and students. The complaints included reports of racial harassment by supervisors, as well as racial discrimination in evaluations, hiring, assignments and workloads. Professor Edward Littlejohn of the law school, co-chairman of the Phylon Society, testified to the existence of racism and to the difficulties of black faculty in receiving tenure and promotion. State Senator David Holmes conducted a legislative investigation of racial discrimination as a result of continued complaints to his office. The Senator filed a complaint with the Civil Rights Commission, which ended in an agreement between the University and the Commission concerning promotion of black assistant and associate professors.

While the Court acknowledges and commends the efforts of President Adamany and the Board of Governors to eliminate race discrimination at Wayne State University, the Court also recognizes and deplores the persistence of instances of racism despite the administration's efforts. The cases of Ben Coleman and Barbara McArthur, as set forth below, attest to the continued existence of pockets of racism in Wayne State University.

### III

Ben Coleman alleges he was subjected to disparate treatment on the basis of race. He also alleges he experienced retaliation and constructive discharge as a result of his candidly voiced and well-known concerns that racism persisted and affirmative action was stagnant at Wayne State University.

Coleman came to Wayne State University after serving in the United States Air Force for 20 years and then working for eight years for the Detroit Board of Education as a Junior R.O.T.C. Instructor and Military Property Custodian. In October 1979, Ross Taylor, the new vice-president for Human Resources, accepted Coleman's application for employment as Personnel Officer I [2] in the Personnel Services Department.[3] At that time, Taylor, also a black man, was beginning to implement his plans for a personnel department more responsive to the needs of the university community, with particular emphasis on affirmative action. Taylor told Coleman he would be the only black personnel officer, and emphasized that Coleman should be sensitive to encouraging the affirmative action hiring of qualified black employees.

---

**2.** Personnel Officer III is the top rank attainable.

**3.** The Human Resources division comprises four departments: Personnel Services, Labor Relations, Staff Benefits, and Classifications and Compensation.

Coleman's immediate supervisor in personnel was employment manager Jack Fobare, a white man. Fobare assigned each personnel officer specific non-academic departments whose staffing needs would be the responsibility of that officer. Coleman's performance impressed his supervisors, and in September 1980 he received a merit increase, raising his salary to $18,-622.

In December 1980, Coleman was temporarily transferred to Labor Relations and reclassified as Personnel Officer II, raising his salary to $21,084. In June 1981, he was transferred back to Personnel Services and reclassified to a Personnel Officer I, with a commensurate decrease in salary. Coleman wanted to stay in Labor Relations, and applied for the vacant position there. His supervisors were pleased with his performance in Labor Relations, but did not offer him the position. Instead, it went to a white male applicant. Although disappointed, Coleman returned to Personnel Services and resumed those duties with the same eagerness and enthusiasm he had previously displayed.

In a 1981 job performance evaluation, Fobare gave Coleman an overall rating of "2", standing for "MEETS STANDARDS: Consistently competent performance." Especially noteworthy is Fobare's top rating of Coleman's attitude and working relationship as "1", standing for "EXCEEDS STANDARDS: Performance exceeds job requirements and expectations." At trial, however, Fobare testified that Coleman's attitude was poor upon his return from Labor Relations, and his discontent and resentment were apparent. Fobare testified that, in his view, Coleman was bitter and therefore focusing his energy on mounting a campaign attacking racism at the University. When asked why he had rated Coleman so high in September 1981, Fobare testified he had overstated the quality of his performance in an attempt to encourage him.

The next several months of Coleman's employment were relatively free of incident. Then, in the spring of 1982, it became Coleman's duty to process applica-

tions for three vacant Accountant I positions in the Finance Division's Office of Accounting. Coleman testified that, pursuant to the customary procedures, he screened the applications, retaining only those candidates with adequate qualifications, and referred a list of applicants to Accounting. That list consisted of a memorandum dated May 4, 1982 from Coleman to the assistant director of accounting naming eight Wayne State University employees who had applied, and 11 outside candidates. Coleman concluded this memorandum by stating:

I call your attention to the University's Affirmative Action policy as you consider these candidates.

Coleman testified that at that time there were no blacks employed as Accountant I in the accounting department, and he simply wanted to make certain the department was aware of the University's affirmative action policy.

In late May 1982, Assistant Controller James Yager visited Coleman's office to inform him that three persons had been selected. He requested that Coleman begin processing them for employment. Two persons chosen were from the list of candidates Coleman had prepared. The other person had previously worked in the Finance Division, and, contrary to customary practice, had been hired without going through personnel. All three were white.

When Coleman asked Yager why no black applicant was found acceptable, a heated exchange followed. Coleman testified Yager initiated the verbal volley, and he responded likewise in a loud voice. Only Coleman and Yager were present in Coleman's office during the altercation. Fobare was aware of their heated disagreement, but did not intervene.

In the summer of 1982, Coleman first became involved in a loosely organized group of persons concerned about affirmative action and equal treatment of minorities at the University. The group, composed of both faculty and staff persons, became formally known as the Wayne State University Black Caucus. A meeting between the Black Caucus and Vice Presi-

dent Arthur Johnson, who supervised Wayne State University's Office of Equal Opportunity, occurred on August 18, 1982. At this meeting, Coleman read a prepared statement expressing the group's shared concerns.

The next day, August 19, 1982, Fobare sent Coleman a four-page memorandum highly critical of Coleman's handling of the vacancies in the accounting department in May and June. Fobare challenged Coleman's judgment regarding eleven of the nineteen applicants Coleman had referred. All eleven targeted by Fobare were black. Fobare said that, because some of these applicants arguably had weak credentials, Coleman had harmed Wayne State University's affirmative action program. However, Fobare expressed no disagreement with Coleman concerning the white applicants he had referred.

For much of this time, Coleman had been actively seeking promotion to a higher level personnel officer position to no avail. His interest was due in part to the promotion of his co-worker, Sheryl Lamarand, a white female, to Personnel Officer II in April 1980. When Coleman was hired in October 1979, Lamarand had worked for the University for several months as a personnel assistant, and for one year as a Personnel Officer I. She came to the University in 1978 with two years experience as a personnel assistant at Michigan Technological University.

Eventually Fobare, responding to Coleman's inquiries regarding promotion by memorandum dated September 9, 1982, requested Coleman to complete a questionnaire so there could be a "formal audit" of his position. Coleman resisted completing the questionnaire on principle. Even so, shortly thereafter, on September 22, 1982, he was promoted to Personnel Officer II. However, on that same day Lamarand became a Personnel Officer III.

In December 1982, Penelope Majeske became acting director, and soon thereafter assistant vice president for Human Resources. An exchange of memoranda between Coleman and Majeske reveals continuing hostility toward Coleman due to his interest in ensuring that the University treat minorities fairly, and comply with its affirmative action policy. On February 25, 1983, Coleman wrote Majeske expressing his concern that affirmative action at the University was not working because departments were regularly rejecting qualified black applicants. Majeske's stinging response of March 7, 1983, while conceding the imperfections of the affirmative action program, essentially informed Coleman that his challenges of the personnel decisions of others on any grounds fell outside his job description, and constituted insubordination. Around this time, Majeske transferred Coleman out of Personnel Services to Staff Benefits to serve as a personnel officer there. Coleman did not fight this move, but neither was it a move he sought.

Coleman's immediate supervisor in Staff Benefits was Maribeth Keller. As a personnel officer in Staff Benefits, Coleman was responsible for assisting current and retired University employees with their fringe benefit packages, and processing the related paperwork. From the beginning, the relationship between Keller and Coleman was strained. When Coleman arrived in Staff Benefits, Keller assigned him to a desk shared with a graduate student in an open area where persons inquiring as to their employee benefits would enter. Marilyn Wilson, an office assistant in Staff Benefits, testified that there was a general feeling among office employees that this was a joke. She opined that, as a professional, Coleman was entitled to at least his own desk with a telephone, if not an office.

After several weeks, Coleman's need for an office was acknowledged. Due to insufficient office space in Staff Benefits, initially he was allowed to reoccupy his old office in Personnel Services, which is located in the same building as Staff Benefits, but one floor above it. Then, in May 1983, he was assigned to an office cubicle shared with a personnel assistant in Staff Benefits.

On April 27, 1983, Keller wrote him that, because she occasionally had trouble locating him, she was setting the following "ground rules": she expected him to be in

his office every day from 8:30–11:30 a.m. and 12:30–5:00 p.m.; if he wanted to leave his office for more than 10 minutes, he would have to get her clearance; and any change in his lunch hour would also require her clearance. By memorandum dated May 10, 1983 Keller relieved Coleman of his duties as a member of the University Activity Committee, a committee concerned with arranging special events at the University. She also told him she expected his involvement with the Campus Ministry, whose mission was dear to Coleman, would be confined to non-working hours. Further, she demanded he inform her how frequently he visited his physician. The tone of Keller's memoranda reveals disrespect and disdain for Coleman. Coleman responded to Keller by memorandum, indicating he felt her treatment of him constituted outright harassment.[4]

While in Staff Benefits, Coleman continued to participate in meetings of the Black Caucus. The group had sought meetings with the President and Board of Governors to voice their concerns that there was a genuine problem with racism at the University. However, the only audience they were granted was with Vice President Johnson in August 1982. Because of this, Coleman testified, the group's collective mood was one of frustration and depression. Eventually the Black Caucus enlisted the help of Michigan State Senator David Holmes. Senator Holmes, after meeting with the Black Caucus and others at the University, concluded some legitimate complaints were being made.

In June 1983, Senator Holmes, acting as a spokesperson for the Black Caucus, held a press conference to air these complaints. At the press conference, reporters interviewed Coleman, who provided them with certain personnel information that he felt evidenced disparate treatment of blacks at the University. Then, in July 1983, Senator Holmes, together with state Senator Lana Pollack, conducted a senate investigative hearing in downtown Detroit to garner more information regarding complaints of discrimination at Wayne State University. At the hearing, Coleman testified at length regarding what he considered to be specific examples of racist behavior at the University. Also testifying were Adamany and other University employees and officials.

Defendant attempted to justify the negative treatment Coleman continually received based on an article published in the campus newspaper relating to the June 1983 press conference. Quoting Coleman, the article reported specific salary information pertaining to named individuals. Coleman apparently divulged this information to illustrate perceived racial inequities at Wayne State University.

The Court concludes that plaintiff Ben Coleman has prevailed on his Title VII action.

4. Pertinent parts of the Coleman's memo dated May 10, 1983 read as follows: "In the three months I have been assigned to Staff Benefits, I have been subjected to the worst kinds of harassment. I had hoped that I would be allowed, as a professional staff member, to learn, study, and perform my duties in a professional setting and manner. At every turn I have been stymied in my effort.

\* \* \* \* \* \*

"When I reported to Staff Benefits, you assigned me to a desk in an open area, with no phone, that I had to share with a Student Assistant; although an Office Assistant and two Personnel Assistants had individual offices. When, after two weeks at my shared desk, I asked for other space as my workplace. I discussed this with you and Penelope Majeske, the Acting Director. I was told that 'as a professional I should be able to work anywhere,' and it was suggested that I share an office with either the Office Assistant or one of the Personnel Assistants.

It was decided that I could work out of the Office of Personnel that I had before the reassignment. Since moving back to my old office, I have received from you numerous memos and notes reminding me that I'm to have lunch from 11:30 to 12:30 every day; that every time I leave my desk, I must call Staff Benefits; and that I must clear with you if I'm to be away for ten minutes or more. I am also the subject of many visits from you during the work day, for no obvious reason, since on many of your visits you merely look to see if I'm in. You have also inquired of the office staff as to how long I've been from my desk. I can understand your wanting your staff to be available at all times; but I have reason to wonder if I am the only one with these explicit, written instructions. If not, I question as to why I'm being singled out for this constant surveillance...."

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), provides:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; ...

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court rendered its classic statement on the shifting burdens of proof in a Title VII case. Plaintiff must first prove, by a preponderance of the evidence, a prima facie case of discrimination. Once shown, the burden of production shifts to the defendant employer to articulate some legitimate, non-discriminatory reason for the actions taken. If the defendant succeeds in doing this, then to prevail the plaintiff must prove that the reason given by the employer was but a pretext for discrimination. *McDonnell Douglas, supra,* at 800–04, 93 S.Ct. at 1823–25.

Plaintiff makes a prima facie case by showing that defendant's actions, if otherwise unexplained, more likely than not were based upon discriminatory criteria illegal under Title VII. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *McDonnell Douglas,* the Court said:

> This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications.

*Id.* 411 U.S. at 802, 93 S.Ct. at 1824.

■ With respect to claims of retaliation, the relevant statute, Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, ... because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The *McDonnell Douglas* shifting of burdens similarly applies in cases of alleged retaliation. *Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.,* 783 F.2d 50, (6th Cir.), *cert. denied* —— U.S. ——, 106 S.Ct. 3298, 92 L.Ed.2d 712 (1986). However, the framework of a prima facie case differs somewhat when the plaintiff alleges retaliation. The plaintiff may establish a prima facie case by showing: (1) he engaged in a protected activity; (2) his employer subsequently subjected him to adverse employment action; and (3) a causal link existed between the two events. *Yates v. AVCO Corporation,* 819 F.2d 630, 637 (6th Cir. 1987); *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982), cited with approval in *Yates, supra.* Again, once plaintiff establishes a prima facie case, defendant assumes the burden of articulating a legitimate, non-discriminatory reason for the adverse action, and then plaintiff may rebut this by showing the articulated reason is merely pretextual.

■ This case also involves a claim of constructive discharge in connection with the alleged Title VII violations. "A constructive discharge exists if 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Yates, supra* (citing *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982), and *Geisler v. Folsom,* 735 F.2d 991, 996 (6th Cir.1984)). To evaluate an allegation of constructive discharge, the Court must ascertain whether the employee reacted objectively reasonably to the employer's conduct and inquire into the employer's intent. *Yates, supra; Held, su-*

*pra.* With respect to the employer's intent, the employer is held to intend the foreseeable consequences of his conduct. Thus, an employer may merely have intended to make life unpleasant for his employee, yet be found liable for constructive discharge, if the reasonably foreseeable impact of the employer's conduct was to cause the employee to quit.

■ As for Wayne State University's treatment of Coleman regarding job promotions, the Court finds there was insufficient evidence that Coleman was denied promotions in violation of Title VII. The evidence raised an inference of discrimination in that, until September 1982, Coleman was denied a promotion to Personnel Officer II, whereas Lamarand's promotion to Personnel Officer II came only one and a half years after she began serving as a Personnel Officer I. However, defendant's evidence was that Lamarand started her employment at the University with two years experience in personnel. Furthermore, defendant evaluated Lamarand's job performance as superior to Coleman's. The fact is, Coleman received a promotion to Personnel Officer II three years after he started working at the University.

The evidence fails to reveal by a preponderance of the evidence a correlation between the timing of his promotion and his race. Also, the Court cannot find that the decision to hire a white applicant instead of Coleman for the permanent position in Labor Relations in 1981 violated Title VII. Coleman provided insufficient evidence that he was qualified for the permanent position, or that the white applicant's qualifications were similar to Coleman's. Thus, Coleman failed to carry his burden of establishing a prima facie case with respect to this incident.

■ Regarding the retaliation claim, the Court finds Coleman clearly established a prima facie case. First, Coleman engaged in activity protected under Section 704 of Title VII, that is, repeated public and private expressions of the belief that the University had serious problems with race discrimination in employment and with affirmative action.[5] Second, Coleman clearly suffered adverse employment action. Fobare's August 19, 1982 memorandum criticizing Coleman's handling of the accounting department vacancies, and challenging Coleman's judgment regarding only the black candidates, was one such adverse employment action. Similarly, Majeske's action in transferring Coleman from Personnel Services, where he was involved in hiring, and had occasion to work for affirmative action goals, to Staff Benefits, a department not officially concerned with these matters, was an adverse employment action. Finally, the treatment of Coleman in the Staff Benefits Department was so adverse as to be humiliating.

Further, the Court finds that there was a causal connection between Coleman's protected activity and the adverse employment action he suffered. The timing of Fobare's memorandum, two and a half months after the incidents discussed in it but only one day after Coleman's public statements on discrimination, makes the memorandum difficult to explain as anything other than retaliation. Similarly, Majeske's transfer of Coleman to Staff Benefits, away from any connection to hiring or affirmative action concerns, came after their heated exchange of memoranda on the topic of affirmative action and equal treatment of minorities at the University. Finally, the Court concludes, after hearing all of the testimony, that Keller's harsh and demeaning treatment of Coleman was causally con-

---

5. Protected activity under Section 704(a) includes more than the filing of a formal complaint alleging a Title VII violation. It extends to an employee's expression of a reasonable belief that the employer has engaged in discriminatory employment practices based on race. *Equal Employment Opportunity Commission v. Crown Corp.,* 720 F.2d 1008, 1013 (9th Cir.1983); *Williams v. Boorstin,* 663 F.2d 109, 115 (D.C.Cir. 1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981). *Holden v. Owens-Illinois, Inc.,* 793 F.2d 745 (6th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986), is distinguishable because Coleman expressed opposition to activities that violated Title VII, i.e. racial discrimination in employment, and did not merely encourage affirmative action hiring by defendant. Furthermore, in this action, defendant has never disputed that Coleman engaged in protected activity.

nected to Coleman's protected activity in that Keller either was instructed, or she determined, to ride herd on an employee who had established himself as a troublemaker by his persistent activities on behalf of affirmative action.

Defendant attempted to demonstrate poor job performance and unethical conduct by Coleman as legitimate non-discriminatory reasons for its actions. The Court finds defendant instead articulated pretexts for poor treatment of Coleman in retaliation for protected activity.

First, as to the quality of Coleman's work, Fobare's testimony lacked credibility. His 1981 evaluation of Coleman indicates he held Coleman in high regard, yet five and a half years later at trial he testified Coleman was uncooperative and exhibited a poor attitude during the time period to which the 1981 evaluation applied. Fobare testified he wrote the 1981 evaluation so as to encourage Coleman. However, the Court finds instead that Fobare's present perceptions are colored by a motive to retaliate against Coleman for the activities in which he later became involved. Second, in 1983, Keller evaluated Coleman's performance as significantly inadequate. However, at that point, she had already subjected Coleman to extremely poor working conditions and unjustifiably stringent demands that the Court can only conclude constituted a form of retaliation for Coleman's involvement in activity protected under Title VII. Third, defendant claims Coleman engaged in unethical conduct by divulging confidential personnel information to the campus newspaper in 1983. This incident did represent a lapse in Coleman's judgment; however, it postdated most of the retaliatory actions found by the Court, and thus cannot be held to have caused them.

▮ The Court concludes Coleman terminated his employment at Wayne State University in January 1984 involuntarily. That is, he was constructively discharged. The foregoing discussion of the conditions under which Coleman was forced to work graphically illustrate conditions "so difficult or unpleasant that a reasonable person

in [Coleman's] shoes would have felt compelled to resign." [6] This he did in January 1984. His reaction was objectively reasonable.

Defendant's intent was to retaliate against Coleman for making a commotion about racism and the lack of compliance with affirmative action at the University. Given the working atmosphere created for Coleman by defendant's employees, the Court finds the foreseeable consequence was Coleman's resignation. Thus, Wayne State University is held to have intended Coleman's termination of employment.

A major purpose of Title VII is to make whole the victim of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The compensation due the victim presumptively includes back pay and reinstatement. *Id.; Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir.1985).

▮ Coleman has requested reinstatement. Therefore the Court orders Wayne State University to reinstate Coleman as a Personnel Officer II in Personnel Services, if this is what Coleman desires. Further, it is ordered that defendant and its employees cease and desist from further retaliation against Coleman, in violation of Title VII.

Coleman is also entitled to back pay to compensate for any difference in the salary he would have received, had he stayed at the University, and his salary as a legislative analyst in Lansing since then. However, there was evidence that Coleman may have received greater remuneration after he left the University. The Court will refer the matter of whether any back pay is due Coleman to this Court's magistrate, who will serve as a Special Master under Rule 53 of the Federal Rules of Civil Procedure.

## IV

Plaintiff Barbara McArthur is a black professor of nursing in the Wayne State University College of Nursing. She alleg-

---

**6.** *See Held v. Gulf Oil Co., supra.*

es that, because of her race, she has been denied adequate salary, receiving far less pay than white full professors in the nursing school. She also presented evidence that in 1986–87 she was paid less than approximately 15 associate professors.

She has bachelor of science and master of science degrees from DePaul University, and a master of science in microbiology and a doctorate in microbiology and epidemiology from the University of Washington. She came to the University as an associate professor in March 1976, and became a tenured full professor in 1978. She is a registered nurse in the state of Michigan.

McArthur's specialty is nosocomial infections. These are infections acquired in a hospital or other in-patient care institution. Often very serious, they include Legionnaire's Disease, AIDS, and hepatitis. The nursing profession is greatly concerned with these dangers, and today every hospital in the United States having more than 200 beds is required to have a nurse specialist in nosocomial infections on its staff.

McArthur is clearly an expert in her field. She is one of only three nurses with a doctorate in this field. When she joined the faculty at Wayne State University, she had already engaged in significant research, published, and spoken nationally and internationally based upon her research. McArthur's record of publication is extensive. She is coeditor and contributing writer to *Nursing Clinics of North America,* a multivolume scholarly publication well-respected in the nursing profession. Since 1983, she has been seriously involved in the research and writing of an epidemiology textbook for nurses. McArthur's record of publications surpasses that of many of her white peers. Because of this, she enjoys wide recognition in her field, and is a fellow of the American Academy of Nursing and the New York Academy of Science. It would unduly lengthen this opinion to review her curriculum vitae thoroughly. Suffice it to say McArthur has written extensively, lectured extensive-

ly, has many publications in referred journals, and has been a leading researcher in the field of infection control in hospitals.

She came to Wayne State University to continue her research and to design the nation's first master's program in institutional epidemiology for nurses. When she first arrived at the University, she also taught in the medical school and the biology department, at their request and by permission of the dean of nursing.

In her first year at Wayne State University, she wrote and submitted proposals for a grant to fund the institutional epidemiology program in the college of nursing. Her proposal received the approval of what was then the Department of Health, Education and Welfare. The program's first students enrolled in the fall of 1977. Over the next several years, up to 1982, McArthur procured grant funds in her field of some $400,000. As long as the program existed, McArthur served as its director.

In addition to writing and implementing an entire new curriculum in infection control, she was responsible for the administration of the grant. As director, she also developed brochures, publicized the program, and recruited students for the program.

When she came to the University in 1976, McArthur had already engaged in laboratory research aimed at identifying the cause of, and preventing, nosocomial infections. While at the University, she has devoted much time in the wet lab continuing this research inasmuch as the college of nursing hired her with the expectation that 50 per cent of her time would be spent in the lab. McArthur's method of bacteriocin typing of the acinetobacter strains [7] has gained her national and international respect. In 1978, she became involved, together with several other professors, with the minority biomedical support grant program at the University. This program was designed to provide minority students with role models in laboratory research and acquaint them with fields of employment still

7. Acinetobacter is a gram-negative strain of bacteria to which many infection epidemics in

health care institutions have been traced.

lacking significant minority representation. For her part of the program, McArthur succeeded in securing approximately $176,-000 in research grant funds. This allowed her to work with several minority students each semester to teach them her methods of researching nosocomial infections. The grant, and the national and international response her research attracted, confirm the significance of her research efforts.

In 1981, McArthur contributed significantly to the Center For Disease Control's first series of infection control guidelines for the prevention of nosocomial infections. She continues to participate in the development of new and revised guidelines that hospitals nationwide refer to as a standard of care.

She has also performed well in the classroom by regularly carrying a substantial teaching load, and has contributed to the college community by participating on many University committees. In 1981, she became a member of the first Certification Board of Infection Control formed for the express purpose of developing a national certification examination for infection control practitioners. In this capacity, she directed a national team of researchers between 1981 and 1984 in a study which defined the scope of the practice of infection control practitioners resulting in the development of the certification examination. More than 2,000 people have become certified infection control practitioners based on that examination.

In summary, she has had a distinguished career in teaching, research, community service, and participation in the University community ever since arriving at the University. She is a recognized leader in her field, and a distinguished professor.

However, the undisputed evidence reveals that McArthur's salary, since the 1978–79 academic year when she became a tenured full professor, has consistently been lower than the salaries of white full professors in the college of nursing. From 1978–79 through 1981–82, McArthur's salary varied from more than $5,000 to more than $8,000 less than the average salaries for white full professors in the college of

nursing. In the 1982 and 1983 academic years, the discrepancy grew to almost $10,-000, and in the 1984 and 1985 academic years, the difference increased to about $13,000. In the 1986–87 academic year, McArthur's salary for nine months was $35,984 as compared with an average salary for white full professors of $56,062.

By developing the nation's first master's program in institutional epidemiology for nurses, McArthur brought significant attention to the Wayne State University College of Nursing. Eventually the college of nursing terminated this program on grounds of low student enrollments. But it is plaintiff's position that she received little or no help from the nursing school administration to develop the program, while other universities have successfully developed and maintained similar programs.

To support her claim of discrimination, plaintiff presented, among other witnesses, Janis Decker, a white woman. Decker is the administrative coordinator for the Wayne State University Chapter of the American Association of University Professors. Decker pointed out that in 1985 the college of nursing was hiring new white assistant professors at a higher salary than was being paid to McArthur. She felt this was completely unjust and clearly reflected racial discrimination. Decker filed a union grievance on McArthur's behalf after computing the average salaries for black and white faculty in the college of nursing and finding that the average black faculty member's salary was below that of white faculty members. At the time of trial, that grievance was still in arbitration.

Significant testimony was given by Kenneth York, an experienced expert in computer-based statistical computation and analysis. He provided unrebutted testimony that there was a statistically significant correlation between race and salary within the college of nursing when computed cumulatively from 1978 to 1986.

York demonstrated that McArthur's salary in each year from 1978, when she became a full professor, through 1985 was significantly lower than salaries of white

full professors in the college of nursing for each of those years. In 1984, her salary was equal to the mean salary for all associate professors that year, which was about $15,000 less than the mean salary for white full professors. York also showed that in 1985 the mean salary of white associate professors was higher than that of black associate professors, and equaled or exceeded McArthur's salary. York testified that the disparity between McArthur's pay and that of white full professors was statistically significant, as well as dramatic.

Attempting to justify the discrepancy in McArthur's salary, the University offered the testimony of Lorene Fisher, dean of the college of nursing. She has been with the college since 1955, and its dean since 1977. She testified that to secure merit increases a professor must prove herself in the fields of teaching, research, and community service. Basically Fisher contends that McArthur is not paid as much as other full professors because of lack of productivity. Fisher claims the discrepancy between McArthur's salary and that of others is the result of McArthur's lack of focused research in recent years, dwindling publications, diminished teaching load, and the fact that, since 1984, there has been a much heavier emphasis on merit increases. Therefore, she testified, McArthur has not earned merit increases, making her salary lower than the salaries of the other full professors, and many of the associate professors in the college of nursing.

Fisher's testimony confirmed McArthur's claims that she got little, if any, support for the development of the master's program from the dean or the faculty. Fisher admitted she did little to support recruitment of students. The evidence revealed that, in early 1982 when McArthur submitted her proposal for continued funding of the institutional epidemiology program, the letters of "support" from Fisher and others that had to accompany the proposal were far from supportive. As a result, McArthur's proposal was rejected, and, beginning in the fall of 1982, no new students were admitted into the program.

Fisher testified that retaining McArthur's program was a problem because it attracted too few students. She said that, because of low student enrollment, it was necessary to terminate the program. In her view, once the program ended McArthur could choose between retraining in another area or leaving the University. In connection with this, Fisher also claimed that McArthur's salary was lower because it was difficult to find classes she could teach after her program ended. The record, however, does not bear out this claim, and shows that McArthur maintained a substantial teaching load throughout, and does to this day.

The Court finds that Fisher's testimony is not substantially supported by the record in view of McArthur's substantial publication record, the many classes she taught, her extensive committee and community participation, her international and national reputation, and her solid research background. McArthur's curriculum vitae credibly attests to her continued enthusiastic dedication to her field of study, notwithstanding the termination of the institutional epidemiology program.

■ The Court finds that McArthur has met her burden of proving discrimination. McArthur, a member of a racial minority, is one of the most distinguished experts in the United States in her field. She has a distinguished record in scholarship, community service, and teaching. This, coupled with the findings of Kenneth York, lead the Court to conclude defendant's treatment of McArthur was more likely than not based upon illegal discriminatory criteria.

The defendant claims to have articulated a legitimate nondiscriminatory reason for denying plaintiff merit raises, and allowing her salary to remain far below that of all full professors, and substantially below that of many associate professors. Defendant claims that, because her program was phased out and because she was not producing as much scholarly work, or teaching as much as she had in earlier years, denying McArthur the merit raises that other faculty members of equal standing received was justified. It claims there

was no discriminatory purpose, but instead a legitimate concern for scholarly research, teaching, and community service.

Defendant's case, however, is not borne out by the facts. The Court finds defendant has stated but a pretext for discrimination. First, one must look at the testimony of Janis Decker. After her investigation of McArthur's union grievance, she strongly felt racial discrimination was responsible for McArthur's level of pay at Wayne State University. But, more importantly, the record of McArthur's teaching in recent years, of her committee activity, of her participation in scholarly pursuits, and of her community affairs activities convince the Court that the reasons defendant has given for McArthur's substantially lower salary are pretextual. Moreover, she has maintained her national and international reputation throughout these years.

Also in her effort to maintain the institutional epidemiology program for nurses, which she founded as the first program of its kind in the United States, she received no support from the dean of the nursing school. In fact, the dean discouraged the continuation of the program. She failed to assist McArthur in recruiting students and getting sufficient funds to maintain a program whose significance can only increase, especially considering present day fears of AIDS, hepatitis and Legionnaires' Disease. The failure of the college of nursing to support McArthur reflects the pretextual nature of their stated reasons for not giving her merit increases.

In sum, considering the evidence set forth above, the Court finds it unbelievable that a person with as distinguished an academic and practical record as McArthur, who brought such prestige to Wayne State University, would be paid so much less than her peers, unless some illegal criterion was the cause.[8] The evidence at trial revealed a primary criterion in determining McArthur's salary was her race. Defendant's suggestion instead that McArthur's productivity did not merit a higher salary is simply untrue, and nothing less than an effrontery. Plaintiff has clearly met her burden of proof, and is entitled to judgment under Title VII.

Therefore, the Court orders that McArthur be awarded a salary equal to the average salary for white full professors in the college of nursing from 1978 to date, and that the college of nursing cease to discriminate against her in the award of merit increases. The Court will refer the matter to its magistrate, sitting as a Special Master under Rule 53 of the Federal Rules of Civil Procedure, to determine the exact amount of the damages.

V

Plaintiff Catherine Sullivan ably represented herself at trial of this matter. She claims she was harassed, treated differently from others when considered for promotion and tenure, and ultimately discharged on the basis of her race.

Sullivan came to Wayne State University in 1969 with a bachelor of science degree in home economics and general science, and a master of arts degree. Until 1974, she was a part-time instructor in the Nutrition and Food Science Division of the Family and Consumer Resources Department in the College of Liberal Arts. Her special responsibility was to develop the curriculum, direct, and teach classes in a non-degree dietetic assistant program.

In 1974, Sullivan was promoted to assistant professor at three-quarters time. Informing her of this appointment, then department chairman Esther Callard added: "I am obliged to point out that this offer of appointment carries no presumption of reappointment or tenure beyond the period stated above."

In the 1976–77 academic year, Sullivan took an academic leave of absence to pursue full time studies at the University of Michigan toward a doctorate in curriculum development and instructional technology.

---

**8.** The law does not require McArthur to show race was the sole cause for the University's actions regarding salary. Rather, she only had to show that "race was *a* 'but for' cause . . ." for her employer's adverse employment decisions. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976) (emphasis added).

Her superiors had advised her that completion of a doctoral program would improve her chances for promotion and tenure. By August 1977, she had satisfied all course requirements. In the fall of 1977, she returned to a full-time position in the Family and Consumer Resources Department.

In May of 1979, Sullivan completed her doctoral dissertation. In the summer of 1980, she submitted an article entitled "Cost-effectiveness of undergraduate programs in dietetics," based on her dissertation, which was accepted for publication in the Journal of the American Dietetic Association in the fall of 1981. About that same time, Sullivan began work on a textbook entitled *Management of Medical Foodservice*. In 1982, she signed a contract to publish her textbook. By 1983 the manuscript was complete, and in 1985 the textbook was published.

For the 1982–83 academic year, Sullivan followed the suggestion of the new acting chairperson, Leora Shelef, and accepted a 90 per cent appointment off the tenure track, in part to enable her to dedicate more time to writing her textbook. However, in the fall of 1983, she returned to full-time status, expressly rejecting Shelef's suggestion that she remain on reduced time.

The evidence is clear that for the duration of her employment at the University, Sullivan was sincerely appreciated as an active and contributing faculty person in her department. She taught and counselled students with enthusiasm, exhibited dedication in curriculum development, and extended her efforts into the community at large. However, in the fall of 1983, when promotion and tenure decisions were made, Shelef informed Sullivan she was denied tenure, and her contract would not be renewed after May 1984.

Defendant's position is that Sullivan was denied tenure in her sixth year on the tenure track because of a weak record of original research. Under a "six year and out" rule, therefore, Sullivan was "out" as of May 1984.

In annual evaluations for the academic years 1977–78 through 1981–82, Sullivan's superiors had urged her to identify a research interest. By virtue of a memorandum circulating in the family and consumer resources department, it was well known, and Sullivan likewise was cognizant, that tenure and promotion decisions were premised on evidence of original research, in addition to superior teaching ability and community service. This was also made clear in the collective bargaining agreement between the American Association of University Professors and the University. In April 1982, at the end of Sullivan's fifth year on the tenure track, Shelef made clear to Sullivan that writing a textbook was not considered research. While valuable, a textbook merely presents information in an organized fashion and serves as a teaching tool.

In her application for tenure in 1983, Sullivan listed no research experience. The only publications she listed were her doctoral dissertation, the article she had published based on her dissertation topic, and the recently completed manuscript of her textbook, which was yet to be published. Testifying at trial, Shelef explained that none of these works evidenced scholarly activity involving original research. She further testified, credibly, that she advised Sullivan to remain on a reduced appointment for the 1983–84 academic year because this would stop the running of the tenure clock and give Sullivan more time to augment her curriculum vitae with the necessary evidence of original research. However, Sullivan declined.

Sullivan claims that Professors Zemel and Powell, both white males in the family and consumer resources department, were treated more favorably than she was because of their race. The evidence was clear, however, that they were granted tenure based on curriculum vitaes attesting to substantial research experience and significantly more research-based publications than Sullivan could take credit for.

■ Applying special scrutiny, considering Sullivan's lack of an attorney, the Court has closely examined the evidence, and concludes that Sullivan has no cause

for action against defendant Wayne State University.

Basically, Sullivan's lawsuit alleges discriminatory discharge and disparate treatment in tenure and promotion decisions. She has also alleged racial harassment in the form of excessive teaching loads and administrative decisions concerning the scheduling of classes. However, the Court finds there is no evidence that her work load differed significantly from that of her white peers, or that any other administrative deicions, including salary differences, raise an inference of racial discrimination.

The same general propositions regarding the order of proof in a Title VII case, applicable to the cases of Coleman and McArthur, apply to Sullivan's Title VII action. However, where the plaintiff alleges discriminatory discharge, to establish a prima facie case she must show: (1) she belongs to a racial minority; (2) defendant fired her without valid cause, and (3) and defendant failed to terminate similarly situated non-minority employees. *Shah v. General Electric Co.,* 816 F.2d 264, 268 (6th Cir.1987). Then, as in all Title VII cases, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the discharge. *McDonnell Douglas, supra.* Ultimately, the burden is on plaintiff to persuade the fact-finder by a preponderance of the evidence that racial considerations, more likely than not, motivated the employer to take the adverse employment action.

Sullivan succeeded in establishing a prima facie case of discriminatory discharge. Certainly an inference of discrimination arises when one considers that defendant terminated Sullivan, a black woman, who, the record tends to show, was highly competent and well-qualified to teach in her chosen field of food management. On the face of it, it appears the only difference between her and other faculty members who were treated more favorably was race.

However, in rebuttal, defendant produced powerful evidence that, although she possessed the basic qualifications for employment at Wayne State University, Sullivan's record of scholarly activity fell far short of what defendant would expect of a tenured faculty member. The two white males to whom Sullivan compared herself were retained and granted tenure on records of research and scholarly publication significantly overshadowing Sullivan's comparatively sketchy record. Sullivan simply failed to counter defendant's evidence with sufficient evidence to justify a finding that defendant terminated plaintiff because she was black, rather than because she had failed to engage in the amount of research that an institution of higher learning demands of its tenured faculty.

Deficient scholarship is a legitimate non-discriminatory reason for denying a faculty member tenure. *Langland v. Vanderbilt University,* 589 F.Supp. 995 (1984), *aff'd mem.,* 772 F.2d 907 (6th Cir.1985). The Court finds this is why defendant refused to renew Sullivan's contract at Wayne State University after May 1984, rather than because she was black, as Sullivan alleges. Therefore, Sullivan's action against defendant is dismissed with prejudice.

## VI

In conclusion, plaintiffs Coleman and McArthur may present judgments in accordance with this opinion, and Wayne State University may present a judgment in accordance with this opinion in the case of Catherine Sullivan.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.