**Robert J. STEIN, Jr., Plaintiff,**

v.

**N.Y.S. DEPT. of MOTOR VEHICLES, Patricia Adduci, Commissioner, Defendant.**

**No. 91–CV–0604.**

United States District Court, N.D. New York.

Dec. 20, 1993.

Robert J. Stein, Jr., pro se.

Robert Abrams, Atty. Gen. of State of NY, Robert A. Siegfried, Asst. Atty. Gen., Albany, NY, for defendant Dept. of Law.

SCULLIN, District Judge.

### MEMORANDUM–DECISION AND ORDER

This is a civil rights action brought by a former employee of the New York State Department of Motor Vehicles ("DMV") who alleges that the DMV retaliated against him by terminating his employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), due to his intention to file an anti-discrimination claim with the DMV's affirmative action office. The matter is presently before the court on Defendant's motion for summary judgment and Plaintiff's cross-motions for summary judgment, and for sanctions. The court heard oral argument on September 24, 1993 in Albany, New York and reserved decision on the motions. This constitutes the Decision and Order of the court.

### BACKGROUND

Plaintiff, a provisional employee of the DMV from February, 1984 to October 2, 1989, alleges that the DMV fired him in retaliation for his intent to file a complaint with Van Holland, the DMV affirmative action officer, alleging that Defendant discriminated against him because he is Jewish. De-

fendant claims that Plaintiff was fired as the result of an investigation that indicated that Plaintiff was using State time and resources to further his own private business interests.

Defendant maintains that in February 1989, Rachel Kretser, an Assistant Attorney General ("AAG") in charge of the Consumer Protection Bureau, referred correspondence to Edward Sheridan (who was then the General Counsel for the DMV), expressing concern that Plaintiff was misusing State resources. This concern stemmed from the discovery of one of Plaintiff's business cards from his "Lemon Law" consulting business (a side business that Plaintiff carried on) with Plaintiff's DMV telephone number handwritten upon it. Defendant's concern was allegedly compounded by its discovery that Plaintiff had made long distance telephone calls amounting to more than $2,000, at DMV's expense, in connection with the "Lemon Law" side business.

In August 1989, James Rose of the FBI was appointed Inspector General for the DMV, and as such had overall supervisory responsibility for the investigation of alleged employee misconduct in the DMV. Mr. Rose directed two investigators, Frank Graziano and Eileen Wolck, to proceed with the investigation of the AAG's allegations against Plaintiff.[1] Plaintiff's phone records were the focal point of the investigation, as they allegedly indicated that Plaintiff had made some $2300.00 of unauthorized calls via his personal identification ("LINKS") telephone number. After reviewing all of the evidence, Rose "concluded that the evidence appeared to indicate a violation of the penal law and activity that warranted termination."[2] Defendant further alleges that "Executive Dep-

uty Commissioner Norman Schneider was informed of the evidence against [Plaintiff] and after review by Department Counsel Edward Sheridan, the case was presented to the [Albany County] District Attorney."[3] After Inv. Graziano presented the case to the District Attorney ("DA") on September 29, 1989, the DA "recommended that [P]laintiff be interviewed and, if he admitted the charges, arrested."[4]

Accordingly, Investigators Graziano, Wolck and State Police Investigator Richard Crist attempted to interview Plaintiff on September 29, but he was out that day, so they interviewed him on October 2, 1989, the next business day. During the interview, Plaintiff admitted to certain of the calls and was terminated from employment.[5] Per standard procedure, Plaintiff was then escorted back to his desk to empty his belongings, and thereafter escorted from the building.

What transpired next is disputed by the parties. Plaintiff alleges that on the evening of October 2, 1989 (the day that DMV fired him) Robert Shaw, a then Deputy Commissioner of the DMV, threatened him that if Plaintiff " 'made waves' by going to the media, to any Jewish activist groups, etc., the Department would have him arrested on felony charges."[6] Plaintiff's son, Daniel Stein, echoes Plaintiff's claim that this "threat" came from Robert Shaw.[7] Plaintiff's son, who claims to have heard the telephone conversation firsthand while listening in on another telephone, alleges that Shaw stated to Plaintiff that, " 'the Department will let things stand with just firing you, but that if you go [sic] the Anti–Defamation League, the papers, or any activist group, or if you make

---

1. Prior to August 1989, little had been done by way of investigation into Plaintiff's case beyond DMV's receipt of AAG Kretser's complaint. Defendant's 10(j) Statement at ¶ 6. Defendant claims that this was due to the fact that the Office of Field Investigations ("OFI"), from which Rose had inherited a number of pending cases, had been engaged in another extensive investigation conducted jointly with the FBI out of the Queens, N.Y. office. *Id.*

2. Defendant's Letter Brief in Support of Defendant's Motion for Summary Judgment ("Defendant's Letter Brief"), Doc. 35 at 3.

3. *Id.* ¶ 9.

4. *Id.*

5. As Plaintiff was a provisional employee, he was not entitled to a hearing prior to termination as required by Civ.Serv.Law § 75 (McKinney 1983). Plaintiff concedes as much in his papers. *See* Plaintiff's Response, Doc. 33 at 17; *see also* Hoffmeister Aff., Doc. 29 ¶ 6.

6. Plaintiff's 10(j), Doc. 33 at 4.

7. *See* D. Stein Aff., Doc. 33 ¶¶ 2–7.

any waves, the Department will have you arrested on felony charges,'" or words to that effect.[8]

Plaintiff further alleges that on October 18, 1989, Inv. Graziano and Richard Crist came to his home and informed Plaintiff's wife that Plaintiff was to "turn himself in to be arrested on October 20, 1989."[9] On October 20, 1989, Plaintiff was arrested and charged with Grand Larceny in the fourth degree. Plaintiff maintains that the arrest resulted from the fact that on October 18, 1989 he was "mistakenly perceived" to have gone to an activist group by William Rourke, a DMV employee, and that therefore, the DMV carried out the "threat" previously alluded to by Shaw.[10]

On January 27, 1990, Plaintiff pled guilty to disorderly conduct in satisfaction of the felony charge, paid a fine and $500 towards restitution. Plaintiff claims that his plea of guilty to the criminal charge was prompted by his desire to "avoid the stress of appearing before a Grand Jury" due to the fact that on November 21, 1989 he had suffered a severe myocardial infarction.[11]

Plaintiff lodged a complaint with the Equal Employment Opportunity Commission ("EEOC") on July 24, 1990. EEOC (through Inv. David Ging) conducted an investigation of Plaintiff's charges, which included a fact-finding conference on November 11, 1990. EEOC found no basis upon which to sustain Plaintiff's retaliation claim, although it did note that the investigation of Plaintiff regarding the phone calls

> started in March 1989; was neglected for several months; and revived with a flurry of activity in late September and early October, 1989. On September 29, 1989, it was claimed that the Charging Party had

made over two thousand, three hundred dollars worth of personal calls at the Respondent's expense. Though this claim was made with more speculation than evidence to substantiate it, the Charging Party was, nevertheless, discharged.

Despite outward appearances, there is no evidence to substantiate the Charging Party's claim that the Office of Internal Affairs conspired with the Charging Party's supervisor or top level management employees to get rid of the Charging Party because of his religious identity, or to prevent him from filing any formal internal complaint of discrimination. Instead, the evidence suggests that the decision to pursue discharge of the Charging Party with little evidence of wrongdoing was the result of the practices of the Office of Internal Affairs at that time.

It should be noted that, according to witnesses, the C[harging] P[arty]'s supervisor, as well as other members of the R[espondent]'s management staff, were aware of other employees who were Jewish and who had filed, or intended to file, charges of discrimination. However, no retaliatory acts, such as alleged by CP, were taken against those employees. Based on this analysis, I have determined that the evidence obtained during the investigation does not establish a violation of the statute.[12]

Plaintiff next appealed the EEOC's determination to the Determinations Review Program, which affirmed the initial determination, stating that, "[o]verall, there is insufficient evidence to substantiate CP's allegation of a violation of Title VII."[13]

Sometime in the fall of 1990, Plaintiff initiated a proceeding pursuant to N.Y.Civ.

---

8. *Id.* ¶ 7. Although neither Plaintiff's affidavit nor his 10(j) specifically implicates Shaw, his son's affidavit does. As the court should apply less stringent standards in reviewing the submissions of a pro se plaintiff, *cf. Mason v. Connecticut,* 583 F.Supp. 729, 730–731 (D.Conn.1984) (citations omitted), and as this is not a crucial point in this case, the court will assume for purposes of Defendant's summary judgment motion that Plaintiff has sufficiently alleged that Shaw was the person responsible for making the "threat."

9. Plaintiff's Response, Doc. 33 at 12.

10. Plaintiff's Response, Doc. 33 at 2.

11. Plaintiff's Memo., Doc. 23 at 5.

12. Complaint at —— (unnumbered) (EEOC "Determination" attached thereto.

13. *Id.* (EEOC "Determination on Review and Dismissal of Title VII Charge" attached thereto).

Prac.L. & R. article 78 ("article 78") seeking an Order in the nature of Mandamus compelling Defendant, *inter alia*, to "reopen" the criminal case. On January 28, 1991, Supreme Court Justice Daniel H. Prior, Jr., Albany County Special Term, issued a Memorandum Decision dismissing Plaintiff's article 78 proceeding.[14] Judge Prior found that Plaintiff failed to show that he had a clear legal right to the relief sought and therefore denied Plaintiff's motion, stating:

> In the instant matter, it appears rather clear that no basis exists for Mandamus compelling respondent to ... "reopen[ ]" the criminal case. Initially, it is noted that petitioner fails to show that he has a clear legal right to the relief sought.... It is significant to note that petitioner pled guilty to a reduced charge rather than contest the allegations against him in an attempt to completely exonerate him from the spectre of guilt.[15]

On April 28, 1991, Plaintiff commenced the present lawsuit in federal court. Plaintiff appears to base his complaint principally upon (1) the proximity of time between Plaintiff's scheduled appointment with Van Holland and Plaintiff's discharge and (2) his assertion that Defendant's claim that it discharged Plaintiff for illegal phone use is a mere pretext, which Plaintiff could prove if allowed to reopen the criminal case.

In support of his claim, Plaintiff submits the affidavit of Jerome Friedman, another Jewish employee who worked with Plaintiff, who states that he also was subjected to harassment and discrimination for many years.[16] Friedman alleges that he was to accompany Plaintiff to Van Holland's office on October 2, 1989 to file the discrimination complaint, and that Plaintiff had sent a memorandum regarding this meeting to Ernest Kitchen (Plaintiff's supervisor) and Richard Smith (Kitchen's supervisor) on or about September 27, 1989.[17] Upon information and belief, Friedman alleges that Kitchen relayed this information to Robert Hogan or William Rourke, two of the individuals against whom Plaintiff and Friedman intended to file the complaint.[18] Friedman adds that Holland told him when he tried to file the complaint that "Jews are not a protected class at DMV," and claims that Smith and Kitchen have made untrue statements in their affidavits in that they *did* know of Plaintiff's intention to file a complaint.[19]

Plaintiff also submits an affidavit from his son, Daniel Stein, who attests that he attended a meeting on November 9, 1990 (presumably the fact-finding conference with EEOC held on November 11, 1990) during which Holland stated that he " 'had been instructed by his supervisors that despite any Federal laws, Jews were not to be treated as a protected class by the Department of Motor Vehicles.' "[20]

Daniel Stein also supports Plaintiff's claim of the "threat" made by Robert Shaw on the evening of October 2, 1989, as previously mentioned.[21] Lastly, Plaintiff's son states that at a meeting held on or about February 1, 1990, he heard Rose apologize to Plaintiff for the "sloppy" manner in which the investigation had been done, and that they had "overlooked many facts."[22]

Each of the parties to this action has moved for summary judgment on the basis of these facts. Defendant's principal contention is that Plaintiff cannot prove the existence of a prima facie case in that Plaintiff cannot establish a causal connection between his discharge and a discriminatory motive underlying that discharge.

In this regard, Defendant argues that none of the individuals involved with the investigation of Plaintiff was aware of Plaintiff's intention to file an anti-discrimination complaint;

---

14. Defendant's Letter Brief, Doc. 35, exh. "C" at 1–2.

15. *Id.*, exh. "C" at 2.

16. Friedman Aff., Doc. 33 ¶ 3.

17. *Id.* ¶ 5.

18. *Id.*

19. *Id.* ¶ 13.

20. *Id.* ¶ 13.

21. D. Stein Aff. ¶¶ 1–9.

22. *Id.* ¶ 11.

conversely, Defendant maintains that those who knew of Plaintiff's plan were not responsible for his discharge.[23] Specifically, Defendant alleges that, "Commissioner Schneider was responsible for authorizing [P]laintiff's termination in connection with the Inspector General's investigation ... [but he] had no knowledge at the time of [P]laintiff's alleged intention to file a discrimination complaint with Van Holland on October 2, 1989."[24] Moreover, Defendant claims that neither Former Counsel to DMV Sheridan, nor Ernest Kitchen, nor Richard Smith knew about the intended complaint.

Furthermore, Van Holland alleges that he did not discuss Plaintiff's appointment scheduled for October 2, 1989 with anyone from the Inspector General's office, or with Sheridan or Comm'r Schneider, nor was he aware of the investigation of Plaintiff.[25] Defendant further maintains that Deputy Comm'r Robert Shaw was neither aware of the investigation nor of the complaint.[26] In this regard, Shaw states that he "has[s] no specific recall of a conversation with Mr. Stein [regarding discrimination] but it is conceivable that [Mr. Stein] came to me with allegations of discrimination in his work place in August 1989."[27]

Plaintiff responds by arguing that many of the above-named individuals *did* know of his intention to file a complaint and/or of the investigation. For example, Plaintiff asserts that Inv. Graziano told Plaintiff on October 2, 1989 that "I know all about your appointment with Van Holland and you will not be allowed to keep it."[28] And, while Plaintiff alleges that "[t]he only other person who knew of the content of plaintiff's intended complaint was Deputy Commissioner Robert R. Shaw,"[29] Plaintiff speculates as to "whom [Shaw] might have told of plaintiff's intent to file a discrimination complaint," based upon the fact that Shaw "shared the executive wing of the fifth floor executive wing of the

DMV building with Schneider, Sheridan, Commissioner Adduci, and other deputies and staff."[30]

In rebuttal, Defendant argues that even if Plaintiff could make out a prima facie case, since Plaintiff has failed to introduce any evidence which would tend to show that the non-discriminatory reason offered by Defendant to explain Plaintiff's discharge was a mere pretext designed to conceal the true, discriminatory motive behind the discharge, the court should grant Defendant's motion for summary judgment.

## DISCUSSION

### *Defendant's Motion for Summary Judgment*

It is well-settled that "[s]ummary judgment is appropriate when 'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Frankel v. Bally*, 987 F.2d 86, 88 (2d Cir.1993) (citations omitted). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (citations omitted). Furthermore, in determining whether a genuine issue of material fact exists, a district court "must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party." *Gibson v. American Broadcasting Co.*, 892 F.2d 1128, 1132 (2d Cir.1989).

It has been noted that "'the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific essential fact to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" *Sample v. Schuller Int'l., Inc.*, 836 F.Supp. 876, 879 (S.D.Ga.1993) (quotation omitted). Furthermore, "[s]ummary judgment is appropriate

---

23. *See* Defendant's 10(j) ¶¶ 17–24.

24. *Id.* ¶ 19.

25. Holland Aff., Doc. 29 ¶¶ 4, 6; Defendant's Letter Brief at 4.

26. Defendant's Letter Brief at 5.

27. Shaw Aff., Doc. 29 at ¶ 3.

28. Plaintiff's 10(j) at 8.

29. *Id.* at 19.

30. *Id.* at 13.

48

where the nonmovant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (citations omitted). Accordingly, in determining the propriety of summary judgment, "'[f]actual disputes that are irrelevant or unnecessary will not be counted.'" *Id.* at 879 (quotation omitted). "The nonmovant 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quotation omitted). "Mere conclusory statements or reliance on the pleadings, ... will not suffice,...." *Id.* (citations omitted).

The court must look to the substantive law to identify which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this case, the court must determine whether genuine issues of material fact exist in the context of a "burden-shifting analysis." *See Sample* at 880 (citations omitted).

Under this analysis, in any Title VII action, a plaintiff "must first establish, by a preponderance of the evidence, a 'prima facie' case of discrimination." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The "establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* This presumption then places upon the defendant "the burden of producing an explanation to rebut the prima facie case—i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason'." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (citation omitted). Once the defendant has met its burden of production by providing a legitimate, nondiscriminatory reason for the discharge, the burden of proof then shifts back to the plaintiff to prove that the defendant's legitimate reason for the discharge is a mere pretext to cover up the true, discriminatory (retaliatory) motive for the discharge. *Devine v. Whelan,* 90 Civ. 6272, 1993 WL 350049 (S.D.N.Y. September 3, 1993) (citation omitted).

In order to make out a prima facie case of retaliation under Title VII, a plaintiff must establish the following: (1) that the plaintiff engaged in an activity protected by Title VII of which his employer had knowledge; (2) that he suffered an adverse employment action; and (3) that there was a causal relationship between the protected activity and the adverse employment action, that is, that a retaliatory motive played a part in the adverse employment action. *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980). Additionally, "courts have recognized that proof of causal connection can be established by showing that protected activity is followed by discriminatory treatment." *Id.* (citing *Hochstadt v. Worcester Found. for Experimental Biology, Inc.,* 425 F.Supp. 318, 324, *aff'd,* 545 F.2d 222 (1st Cir.1976); *Aguirre v. Chula Vista Sanitary Serv. and Sani–Tainer, Inc.,* 542 F.2d 779, 781 (9th Cir.1976)). Further, it has been held that a close proximity in time between a plaintiff's protected activity and his/her discharge "raises an inference of a causal link between the activity and the discharge." *Devine,* 1993 WL 350049, at *3; *see also Aguirre,* 542 F.2d at 781.

Considering all of the facts in the light most favorable to Plaintiff, the court finds that Plaintiff has established a prima facie case. As to the first element, it has been held that protected activity encompasses more than the filing of a complaint; e.g., it can include an employee's "expression of a reasonable belief that the employer has engaged in discriminatory employment practices based on race." *Coleman v. Wayne State Univ.,* 664 F.Supp. 1082, 1092 n. 5 (E.D.Mich. 1987) (citations omitted). Thus, applying this criterion, Plaintiff's assertions that he informed certain persons within the DMV that he intended to file a complaint concerning DMV's alleged discriminatory treatment of Jews alone establishes the first element.

As to the second element, it is incontrovertible that the discharge of Plaintiff constituted an "adverse employment action." And, it can be inferred, for the purposes of establishing a prima facie case, that the close proximity in time between Plaintiff's protected activity and his discharge establishes a

causal link between the two. *See Devine* at *3. Thus, Plaintiff has met his burden of production regarding each of the elements of a prima facie case and has thereby satisfied the first phase of the burden-shifting analysis.

■ Since Plaintiff has made out a prima facie case of retaliation, the court must next determine whether Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's discharge. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (citation omitted). In this regard, Defendant asserts that Plaintiff was discharged for misuse of state resources; e.g., that, *inter alia,* Plaintiff made over $2,300.00 in unauthorized phone calls at DMV's expense over a period of approximately eighteen months.[31] Defendant also argues that the criminal charges levied against Plaintiff support Defendant's contention that nondiscriminatory reasons existed for the discharge of Plaintiff. As previously noted, judgment in the criminal case was entered against Plaintiff under a plea bargain agreement whereby the charge of Grand Larceny in the fourth degree was reduced to disorderly conduct in return for a plea of guilty by Plaintiff.[32]

The Supreme Court recently clarified the third phase of the burden-shifting analysis in holding that although the burden of production shifts to the defendant in the second phase, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (citation omitted). Thus, "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2748.

Accordingly, the Court finds, without weighing the credibility of the reason offered, that Defendant has met its burden of production by offering a nondiscriminatory reason for Plaintiff's discharge. Therefore, the burden once again shifts to Plaintiff who must rebut the nondiscriminatory reason for the discharge given by Defendant.

As best as can be ascertained from his submissions, Plaintiff apparently relies upon two separate grounds to argue that the unauthorized phone usage was a mere pretext for his discharge. First, Plaintiff claims that he is innocent of the phone charges, i.e., that the court should reopen the criminal action. Second, Plaintiff argues that the threats he received on October 2 and 18, 1989 about the prospective repercussions if he went to any anti-defamation, etc., groups *after his discharge* support Plaintiff's claim that the actual *discharge* itself was retaliatory. The court will examine each of these *seriatim.*

In order to show that the criminal conviction entered against Plaintiff is a mere pretext for Plaintiff's discharge, Plaintiff first asks that the court "reopen" the issue of his guilt with regard to the unauthorized phone calls he allegedly made. Defendant argues that under New York law Plaintiff's plea of guilty to the criminal charges should collaterally estop Plaintiff from relitigating the issue of his guilt with regard to the illegal phone use.[33]

It is well-settled in New York that

[t]he doctrine of collateral estoppel, a narrower species of res judicata, precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.

*Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487, 490 (1984) (citations omitted).

However, the party against whom collateral estoppel is to be applied must have had a full and fair opportunity to litigate the issue. *Id.* at 501, 478 N.Y.S.2d at 826–827, 467 N.E.2d at 490–492. In determining whether a party had a full and fair opportunity to litigate the issue in a prior proceeding, the court should consider such factors as "the nature of the forum and the importance of

**31.** Defendant's Notice of Motion, Doc. 29 at 3.

**32.** Defendant's Letter Brief, Doc. 35 at 3.

**33.** Defendant's Letter Brief, Doc. 35 at 6–7.

**50**

the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation." *Id.* at 502, 478 N.Y.S.2d at 827, 467 N.E.2d at 491 (citations omitted). In deciding whether collateral estoppel should preclude the relitigation of an issue "the burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in [sic] prior action or proceeding." *Id.* at 502, 478 N.Y.S.2d at 827, 467 N.E.2d at 491 (citations omitted).

 Plaintiff alleges that the criminal proceeding did not provide a full and fair opportunity to litigate the issue of his guilt with regard to the phone charges as he was compelled to plead guilty due to a heart problem he experienced at that time, which made it impossible for him to defend himself against the charges.[34] The court need not decide whether this explanation would satisfy Plaintiff's burden of proving that he did not have a full and fair opportunity to litigate the issue of his guilt in the criminal proceeding, as resolution of this issue is unnecessary in deciding Defendant's summary judgment motion. Even if Plaintiff were allowed to relitigate the issue of his guilt with regard to the phone misuse charges and he could show that he was innocent of the criminal charges levied against him, this would not resolve the question of whether Defendant is liable for discharging Plaintiff, as Defendant is liable under Title VII only if Plaintiff can prove that Defendant fired him for retaliatory reasons. In other words, as long as Defendant discharged Plaintiff based upon its belief that Plaintiff misused state resources and Plaintiff is unable to provide sufficient proof that this belief is a mere pretext for discharge, Defendant is not liable under Title VII. Moreover, liability cannot be imposed

upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated.* . . . But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

*Hicks,* —— U.S. at ——, 113 S.Ct. at 2751 (emphasis in original). Thus, Plaintiff must affirmatively establish that he was discharged for retaliatory reasons; it is insufficient to merely disprove the validity of the nondiscriminatory reason(s) proffered by Defendant. *See id.* Plaintiff's proof in this regard is inadequate, as it is mainly limited to the proximity between the time of the scheduled appointment with Van Holland and his discharge—as previously discussed, this goes to the establishment of a prima facie case, but not to the issue of pretext. The court therefore finds that Plaintiff has failed to provide sufficient evidence to substantiate the first of his arguments regarding retaliation and the pretextual nature of the reason given by Defendant for the discharge, and must next consider the second of Plaintiff's contentions in this regard.

 Plaintiff's second pretextual argument is based upon his claim that *post-discharge* criminal charges were levied against him in retaliation for his having been perceived to have gone to a Jewish activist group. It appears that Plaintiff would ask the court to retroactively consider this alleged post-discharge retaliatory act as proof that his discharge was based upon a retaliatory motive.[35] The court finds this argument unpersuasive, since it has located no authority which would permit post-discharge conduct to be utilized in order to prove that the discharge itself resulted from a retaliatory motive.

---

34. Plaintiff's Memorandum, Doc. 23 at 5.

35. The court could infer that Plaintiff is asserting one of two arguments based on the alleged post-discharge threats: first, that the post-discharge

threats prove that the actual discharge was retaliatory; and/or second, that the threats constitute a retaliatory act in and of themselves.

51

The court reaches a similar conclusion in examining Plaintiff's second argument. The Second Circuit has noted that Title VII "prohibits discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct." *Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978). Thus, the fact that the alleged retaliatory "threats" and arrest occurred after Plaintiff's discharge does not automatically preclude him from maintaining this claim. However, even if Plaintiff's allegations of post-discharge "threats" to arrest him and charge him with a felony were bona fide, they would not provide a sufficient basis for defeating Defendant's motion for summary judgment, since the alleged "threat-makers" (Graziano and Crist) were neither responsible for arresting Plaintiff nor for his discharge. And, regarding the alleged "threat" made by Shaw, Plaintiff has provided no proof that Shaw had any control over whether Plaintiff was to be arrested. In short, Plaintiff has provided no proof that the decision to arrest him was in any way influenced by Defendant; i.e., that this decision did not remain within the sole province of the office of the District Attorney.

To summarize, Plaintiff has failed to provide competent evidence that rebuts Defendant's tendered explanation for Plaintiff's discharge. Although the court finds Plaintiff to be a sympathetic and sincere litigant, the court simply cannot ignore the clear tenets of summary judgment. As Plaintiff has failed to substantiate, beyond conclusory allegations, that genuine issues of material fact exist as to whether Defendant's discharge of Plaintiff was motivated by retaliatory animus, the court must grant Defendant's motion for summary judgment.

*Plaintiff's Motion for Sanctions*

Plaintiff attempts to bring a motion for sanctions against Defendant based upon his allegation that Defendant purposely destroyed a videotape recording of the fact-finding conference conducted by the EEOC concerning his charge against Defendant.[36] However, Inv. David Ging attests that he was responsible for erasing the videotape.[37] Plaintiff has submitted no factual allegations to dispute Ging's assertion, or to support Plaintiff's claim that the DMV was responsible for the destruction of the videotape; thus, the court summarily denies this motion.

## CONCLUSION

Defendant's motion for summary judgment is hereby GRANTED and Plaintiff's complaint is DISMISSED. Plaintiff's motion for sanctions is DENIED.

**IT IS SO ORDERED.**

---

**36.** Plaintiff's Motion for Sanctions Based Upon Adverse Inference Due to the Deliberated [sic] Destruction of Material Evidence, Doc. 40.

