Phyllis **HARKER**, Plaintiff,

v.

**UTICA COLLEGE OF SYRACUSE UNIVERSITY, James Spartano, in his official capacity of Athletic Director, and Michael Simpson, President of Utica College, Defendants.**

No. 93–CV–1504 (FJS) (GJD).

United States District Court,
N.D. New York.

April 24, 1995.

Seidenberg, Strunk & Goldberg (Faith A. Seidenberg, of counsel), Syracuse, NY, for plaintiff.

Bond, Schoeneck & King (Joseph C. Dole, John Gaal, of counsel), Syracuse, NY, for defendants.

## DECISION AND ORDER

SCULLIN, District Judge.

### INTRODUCTION

This case is before the court on defendants' motion for summary judgment. Plaintiff, a former women's basketball coach at Utica College (the "College"), brought this action pursuant to Title VII, Title IX, and the Equal Pay Act, alleging that she was discriminated against based on her gender and that her employment contract was not renewed by defendants after she complained about the inequities between her job and that of the male basketball coach. Defendants, Utica College, James Spartano, College Athletic Director and Michael Simpson, College President, deny these allegations, and move for summary judgment on the grounds that: (1) plaintiff's claims under Title IX regarding the College's athletic program generally are not justiciable; (2) plaintiff cannot state a prima facie case of discriminatory termination, and can produce no evidence that she was discharged because of her gender; and (3) plaintiff's salary disparity claim fails because she cannot show she was paid less than similarly situated male employees.

### BACKGROUND

Plaintiff was hired to coach the women's basketball team at Utica College for the 1990–91 academic year. At the time of her hiring in 1990, plaintiff had a bachelor's degree and nine years of college basketball coaching experience at the Division III and junior college levels.[1] Def. 7.1(f) ¶ 4. After accepting the position, plaintiff agreed to the terms of her contract with defendant James Spartano, the Athletic Director at the College. Under the terms of her original contract, plaintiff was employed for ten months, and received compensation of $25,000 for coaching basketball and performing teaching duties, with an additional $3,000 for coaching women's softball. These terms were consistent with the original offer submitted by Mr.

---

1. Plaintiff contends that she had at least ten years of college coaching experience at the time that she was hired, however this fact was not disputed in her 7.1(f) reply, nor would it have created a material issue even if it had been contested.

Spartano to the plaintiff, she did not attempt to negotiate any changes in the compensation or benefits provided. Spartano Aff. ¶ 8.

Since 1987, the head coach of the men's basketball team at the College has been Edwin Jones. Mr. Jones was hired as men's head coach in 1987 after the College dropped from a Division I school to a Division III school. At the time of his appointment as head coach, Mr. Jones had a master's degree, and a total of fourteen years of college coaching experience, the last six coming as an assistant at the College when it was in Division I. *Id.* ¶ 5. In 1987, Mr. Jones was given a multi-year contract with a starting salary of $23,000.[2] *Id.* By 1990, when plaintiff was hired, Mr. Jones had seventeen years coaching experience, including nine years at the College, and was making $32,500. In addition to this compensation, as part of his contract, Mr. Jones negotiated an arrangement whereby the College would pay for half of his auto insurance and provide him with a monthly auto allowance. This was a continuation of an arrangement that was in place while Mr. Jones had served as an assistant coach at the College, the purpose of which was to reimburse him for expenses incurred in connection with recruiting trips. *Id.* ¶ 8.

Plaintiff's contract was renewed in 1991, when her salary was increased to $25,765, and again in 1992, when her salary was increased to $29,916. In early March 1993, however, defendant Spartano approached defendant Simpson regarding plaintiff's performance of her coaching duties. Spartano Aff. ¶ 13. At that time, defendant Spartano expressed concern about whether the College was going to be able to field a women's basketball team for the 1993–94 season. *Id.* ¶ 45. This concern was based upon defendant Spartano's realization that only one member of the 1992–93 team would be returning to the team for the next season if

plaintiff remained as coach.[3] *Id.* ¶ 43. In addition to the dwindling number of returning players to the 1993–94 women's basketball team, the defendants were concerned with the fact that plaintiff had not been successful in recruiting new players for the team. *Id.* ¶ 34.

As early as January 1993, defendant Spartano met with plaintiff in regard to her recruiting efforts for the 1993–94 team. Spartano Aff. ¶ 34; Harker Dep. 93–94. Another meeting was held in February, at which point defendant Spartano asked plaintiff to provide him with a list of players that she was recruiting for the 1993–94 team. Spartano Aff. ¶ 35. Plaintiff ultimately provided him with a list of names of recruits and defendant Spartano proceeded to investigate the recruits on the list. Def. 7.1(f) ¶ 14. As a result of his investigation, defendant Spartano found that the names on the list were primarily students who had expressed an interest in basketball on their Admissions materials rather than players who had been actively recruited by plaintiff, and that no high quality players had committed to play for the College. *Id.;* Spartano Aff. ¶ 34–42.

In addition to this perceived failure to adequately recruit, defendant Spartano also informed defendant Simpson of his concern over complaints that members of the 1992–93 team had regarding plaintiff's coaching.[4] *Id.* ¶ 32–33, 45. One student, in particular, informed defendant Spartano that, as a result of her experiences on the 1992–93 basketball team, she did not intend to play basketball in 1993–94 and she wanted to transfer out of Utica College. Hyry Aff. ¶ 20. Additionally, at the end of the 1992–93 season, defendant Spartano had the two full time coaches at the College, plaintiff and Mr. Jones, evaluated by the senior members of their respective teams. Def. 7.1(f) ¶ 17. There were two senior members of the 1992–93 women's bas-

---

**2.** While Mr. Jones received a three year contract, it was originally based upon ten-month academic years rather than full twelve month years. Jones Aff. ¶ 5. This contract was extended in 1988 to create a twelve month appointment. *Id.* ¶ 7.

**3.** Six of the eleven members of the '92–'93 team were graduating seniors, two others had left the team during that year, and two more notified defendant Spartano that they would not return to

the team if plaintiff were still the coach. *Id.* ¶¶ 34 & 43.

**4.** In addition to complaints from members of the women's basketball team, defendant Spartano received complaints from several members of the women's softball team which was also coached by plaintiff. Spartano Aff. ¶¶ 21–24, 26.

ketball team, both of whom submitted unfavorable evaluations of plaintiff. Def.Not. of Mot.Ex.L.

As a result of her poor recruiting and bad rapport with her players, on April 5, 1993, defendant Spartano notified plaintiff that he had recommended that her contract not be renewed for the 1993–94 year by defendant Simpson. Spartano Aff. ¶ 46–47. That same day, plaintiff met with defendant Simpson to discuss defendant Spartano's recommendation. Simpson Aff. ¶¶ 15–17 & Ex. O. Plaintiff claims that, during this meeting, she complained about the inequities that existed between the terms of her employment and those of Mr. Jones. Soon after this meeting, defendant Simpson had a meeting with defendant Spartano in which Simpson approved the recommendation that plaintiff's contract not be renewed. Simpson Aff. ¶ 19. Defendant Spartano then met with plaintiff and notified her of defendant Simpson's decision. Spartano Aff. ¶ 50. Thereafter, plaintiff submitted her letter of resignation. Harker Dep. D, pp. 46, 120.

## DISCUSSION

### SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is warranted if, when viewing the evidence in the light most favorable to the non-movant, the court determines that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 457–58, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Commander Oil v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir.1993). The burden of showing that no genuine issue of material fact exists rests on the moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). Where the moving party does not bear the ultimate burden of proof at trial, the summary judgment burden may be satisfied by pointing out the absence of evidence to support the non-movant's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant shows the absence of such evidence, the burden of persuasion shifts to the non-movant to show that the record contains sufficient evidence to establish each element of its case. *Id.,* at 322, 106 S.Ct. at 2552.

Where a non-movant's opposition to a motion for summary judgment consists of "merely ... vaguely asserting the existence of some unspecified disputed material fact, or ... mere speculation or conjecture," *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990), offering specific factual assertions in memoranda of law or at oral argument, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994), or relying on the pleadings themselves, *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, the non-movant has not met its burden. To the contrary, a non-movant may only demonstrate the existence of elements essential to its case, which it would have the burden of proving at trial, through the use of affidavits, depositions, answers to interrogatories, or admissions. Fed.R.Civ.P. 56(e). A party who fails to use these evidentiary devices to "set forth specific facts showing that there is a genuine issue for trial," *Id.,* has failed to demonstrate that the record contains a genuine issue of material fact, and thus, has not successfully resisted the entry of summary judgment.

### PLAINTIFF'S CLAIMS

At the outset, it should be noted that plaintiff has failed to contest the majority of facts contained in defendants' Local Rule 7.1(f) statement of undisputed facts. Pursuant to that rule, once the defendants submitted their statement of uncontested facts, plaintiff was required to submit a reply statement which contained the material facts as to which she contends a genuine issue exists, including specific citations to the record. Local Rule 7.1(f). Plaintiff's failure to contest many of the facts contained in defendants' 7.1(f) statement entitles the court to deem the facts which are not controverted by plaintiff's 7.1(f) response to be admitted for purposes of deciding whether summary judgment is warranted. *Id.; Thornton v. City of Albany,* 831 F.Supp. 970, 979 (N.D.N.Y.1993) (McCurn, J.). However, although entitled to rely on the defendants' 7.1(f) statement in

deciding the present motion, the court finds that it need not do so since the facts alleged there are clearly supported in the record.

## TITLE VII RETALIATION

■ Section 704 of Title VII of the Civil Rights Act of 1964 prohibits retaliatory actions against employees who oppose alleged discriminatory practices. *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1038 (2d Cir. 1993). Section 704(a) of the act provides

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter....

42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation under Title VII plaintiff must show: (1) she was engaged in protected activity which was known to the defendant, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991).

■ The Supreme Court has held that the "establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). This presumption then shifts the burden of production to the defendant to show that there were nondiscriminatory reasons for the adverse employment action. *Stein v. N.Y.S. Dep't of Motor Vehicles,* 841 F.Supp. 42, 48 (N.D.N.Y.1993) (Scullin, J.), *aff'd,* 54 F.3d 766 (2d Cir.1995). Once the defendant has met its burden and articulated legitimate, nondiscriminatory reasons for its actions, the burden shifts back to the plaintiff to prove that the asserted reasons are a pretext to cover up the true retaliatory motive. *Id.* This, then, is the framework through which the court must address these claims.

■ In assessing whether plaintiff has established a prima facie case, a question arises as to whether the plaintiff engaged in any protected activity sufficient to satisfy the first element. While it is clear that voicing complaints about discriminatory employment practices are sufficient to constitute protected activity under Title VII,[5] there is some doubt as to whether plaintiff's actions even reached this level. Plaintiff contends that the decision not to renew her contract was made as a result of a meeting she had with defendant Simpson on April 5, 1993, in which she complained about the "glaring inequities between herself as the only female coach and the other head coaches, all male." Complaint ¶ 14. This meeting occurred after plaintiff had been notified by defendant Spartano that he had recommended to defendant Simpson, whose decision it was, that he not renew plaintiff's contract for the 1993–94 academic year. Spartano Aff. ¶ 47.

When asked, at her deposition, to elaborate on the inequities between herself and other coaches which she allegedly raised at this meeting, plaintiff stated that she was only referring to inequities between herself and Ed Jones, the men's basketball coach. Harker Dep. at 52. Additionally, plaintiff could not recall what inequities she discussed with defendant Simpson at this meeting. *Id.* at 53. She testified that she did not request that defendant Simpson give her a multi-year contract like Ed Jones, nor did she discuss whether she could get a car allowance, or whether she could get more money for her basketball program. *Id.* at 54. The one subject that plaintiff definitely recalled discussing with defendant Simpson, was her belief that defendant Spartano was having her team members fill out evaluations of her, while no other teams were doing the same for the other coaches.[6] *Id.* at 54–55.

5. Protected activity under Title VII includes, inter alia, "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990).

6. In her deposition, plaintiff states that she also discussed these perceived inequities with two women, Joan Kay and Jean Wolf. Harker Dep.

Defendant Simpson's recollection of the April 5, 1993 meeting is somewhat different than plaintiff's. Simpson states that

> Ms. Harker did not raise any issues involving a comparison of her compensation and benefits to those of Mr. Jones. Nor did she raise any issues regarding inequitable treatment of female athletes. She did ask me whether she was the only coach who was being evaluated by her players. I told her no, that we had decided to evaluate both full-time coaches.

Simpson Aff. ¶ 18. Due to the fact that the question regarding the coaching evaluations was the only undisputed topic of conversation at the meeting, a question exists as to whether plaintiff's complaints are sufficient to constitute allegations of discriminatory treatment by the College.

Assuming that plaintiff's conversation with defendant Simpson on April 5, 1993, was sufficient to satisfy the first element, the court must look to the second element which requires that plaintiff suffer an adverse employment action. Here, it is undeniable that plaintiff's contract was not renewed, therefore this element is satisfied.

██ The final element which plaintiff must establish is that there was a causal connection between her conversation with defendant Simpson and the non-renewal of her contract. As to this element, the court may infer a causal connection between the alleged protected activity and the non-renewal due to the close proximity in time between the two. *Stein,* 841 F.Supp. at 48. This causal connection can only be found in regard to plaintiff's claim against defendant Simpson, however, because, as stated above, defendant Spartano had made his recommendation not to renew the contract *before* the April 5 meeting took place. Therefore, as a matter of law, there could not have been any causal connection between plaintiff's conversation with defendant Simpson and defendant Spartano's recommendation of non-renewal. Accordingly, defendant Spartano is entitled to summary judgment on plaintiff's Title VII retaliation claim.

██ Examining the record in the light most favorable to plaintiff and drawing all possible inferences in her favor causes the court to find that she has established a prima facie case of retaliation under Title VII. Therefore, as stated above, the burden shifts to the remaining defendants, Simpson and the College, to show that they had legitimate, nondiscriminatory reasons for not renewing her contract.

██ In regard to the decision not to renew plaintiff's contract, defendant Simpson stated that he made the final decision after individual meetings with defendant Spartano and the plaintiff. Simpson Aff. ¶¶ 13–19. His decision was based primarily upon two factors, (1) plaintiff's failure to properly perform her duties, particularly her failure to recruit new players, and (2) student complaints regarding plaintiff's coaching. In addressing this phase of the burden-shifting analysis, the Supreme Court has stated that "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2748. Therefore, the court, without weighing the credibility of the reasons set forth, finds that defendants have met their burden by producing legitimate, non-discriminatory reasons for the non-renewal of plaintiff's contract.

██ In light of the legitimate reasons offered by the defendants for the non-renewal, the burden shifts back to plaintiff to rebut the reasons given for her non-renewal. *Stein,* 841 F.Supp. at 49. The burden is shifted back to the plaintiff because, "the plaintiff at all times retains the ultimate burden of persuasion." *Cosgrove,* 9 F.3d at 1039 (citations omitted).

██ In her attempt to prove that the reasons set forth by defendants for their decision not to renew her contract were pretextual, the plaintiff has failed to cite to anything in the record which would serve to

---

at 56. There is, however, no indication of the substance of these conversations, and there is absolutely no allegation that defendants were

aware of these conversations at the time of the decision not to renew.

rebut those reasons. In attempting to rebut the charge of failure to recruit, plaintiff raises several reasons for her poor recruiting record. First, plaintiff argues that she had problems recruiting because she did not have the same advantages that the male coach had. Pl.Mem. in Opp. at 16. This argument refers to the fact that the coach of the men's basketball team was given an auto allowance and a recruiting budget. *Id.* at 3. The record belies such an argument, however, as plaintiff admitted in her deposition that she had a recruiting budget, and that the College never denied her requests for funds. Harker Dep. at 31–33, 62. Additionally, plaintiff admitted that she was entitled to use a college-owned car for recruiting trips and that she was reimbursed for mileage incurred while using her own car for such trips. *Id.* at 33–34. Furthermore, plaintiff stated that, after learning that the coach of the men's team got an auto allowance, she never requested a similar arrangement. *Id.* at 34–35, 54.

Plaintiff further attempts to rebut the failure to recruit charge by arguing that because Utica College is a Division III school "there is very little to offer an athlete." Pl.Mem. in Opp. at 3. In support of this argument, plaintiff cites to statements made by Mr. Jones, the men's basketball coach in regard to the difficulties of recruiting. Jones Dep. at 52. The difficulty in the process is not, however, disputed by the defendants. In fact, Mr. Jones concedes that the process is difficult but states that he "recruited every player who played on the 1990–91 (12 players), 1991–92 (15 players) and 1992–93 (17 players) teams." Jones Reply Aff. at 2. Therefore, this argument is not sufficient to rebut the defendants' stated reason of failure to recruit.

Plaintiff attempts to rebut defendants' claim that they did not renew her contract in part because of the students complaints about her coaching, by citing positive evaluations of her teaching abilities. Pl.Ex.G. These evaluations, while undoubtedly positive, are irrelevant to the case at bar because they are not related to plaintiff's coaching. It is undisputed that plaintiff was hired primarily to coach women's basketball, her teaching duties comprised only a small portion of her total responsibilities. Therefore, these positive *teaching* evaluations cannot serve to rebut the complaints and negative *coaching* evaluations. Nor can plaintiff's assertion that "it was not unusual" for coaches to have difficulties with players serve to establish that defendants' stated reasons were pretextual. Pl.Memo. in Opp. at 3. In fact, the reason stated by defendants was not that plaintiff had "difficulties" with her players, but that the situation was so bad that players went to the Athletic Director to complain about plaintiff's coaching. Spartano Aff. ¶ 43.

In a further effort to establish that the reasons set forth by defendants for their decision not to renew her contract were pretextual, plaintiff attempts to show that defendant Spartano had a "past hostility towards women and women's sports." Pl.Mem. in Opp. at 14. In support of this argument, plaintiff cites to the deposition of Joan Kay, a former coach at the College, in which she stated that she *felt* "that if push came to shove and it was men's programs versus women's programs, the women's programs would go." Kaye Dep. at 32. Ms. Kaye did not, however, state any particular things that were done by defendant Spartano or anyone else which gave rise to this "feeling." [7] Such an unsupported, conclusory statement can hardly be sufficient to show that the reasons set forth by defendants were merely pretextual.

The Second Circuit has clearly held that under the Title VII burden-shifting analysis, in order for plaintiff "to defeat defendant[s'] properly supported motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief *and* (2) more

---

**7.** Plaintiff also submitted affidavits of two former employees of the Athletic Department which were intended to support this claim of Spartano's hostility towards women. Defendants objected to the admissibility of these affidavits, however, as they were not notified of the fact that these people possessed any relevant information prior to the submission of their affidavits. The court need not address that argument, however, as the contents of the affidavits do not provide any strength to plaintiff's arguments. Maggiolino Aff. & Chmielewski Aff.

likely than not the employee's [complaint] was the real reason for the discharge." *Woroski v. Nashua Corp.,* 31 F.3d 105, 108–09 (2d Cir.1994). Here, the evidence clearly established dispositive nondiscriminatory reasons for defendants' decision not to renew plaintiff's contract, and plaintiff failed to establish any genuine issue as to these reasons. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995). In fact, when asked why she thought her contract had not been renewed, plaintiff answered that "Mr. Spartano was unhappy with [her] recruiting." Harker Dep. at 118. Therefore, defendants Simpson and Utica College are entitled to summary judgment on plaintiff's Title VII retaliation claim.

## TITLE VII DISCRIMINATION

Plaintiff has failed to properly address whether she is pursuing a Title VII discrimination claim in addition to her retaliation claim. Her papers are unclear as to this issue, as were her responses to the court's inquiries at oral argument. Nevertheless, the court finds that were such a claim advanced, it would not withstand defendants' motion for summary judgment.

■■■■■ In order to establish a prima facie case of discriminatory discharge, plaintiff must show that she (1) was a member of a protected class; (2) was qualified for the position; (3) was discharged from that position; and (4) the discharge occurred in circumstances which give rise to an inference of gender discrimination. *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). As with a Title VII retaliation claim, once the plaintiff has established a prima facie case, the burden of production shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the discharge. *Id.* (citation omitted). Once the defendants have satisfied this prong of the test, the plaintiff must establish by a preponderance of the evidence that the reasons set forth by defendants are merely pretextual. *Id.*

■■■■■ In the case at bar, plaintiff has satisfied the first element of the prima facie case, as she is a member of a protected class. There is some question as to whether she was qualified for the position, as her contract was not renewed due to her poor performance of her duties. There is also a question of whether plaintiff's non-renewal was under circumstances which give rise to an inference of gender discrimination.

Plaintiff argues that an inference of gender discrimination can be drawn from the circumstances surrounding her non-renewal. She cites to the fact that after she was not renewed, no formal search was conducted and she was ultimately replaced by a male, James Spartano. While plaintiff concedes that a woman was hired to coach the team after the 1993–94 season, she contends that she was more qualified than her female replacement.

Once plaintiff's contract was not renewed, defendants Spartano and Simpson decided not to conduct a formal search for a new coach for the 1993–94 season. Spartano Aff. ¶ 53; Simpson Aff. ¶ 21. This decision was made because both defendants felt that, since it was already April, it was too late in the year to attempt to find a qualified coach, and they were hesitant to hire a new coach for a team with so few remaining players. *Id.* Thereafter, Mr. Spartano offered the job to two women, both of whom turned it down. Spartano Aff. ¶ 54; Simpson Aff. ¶ 22. Once it became clear that Mr. Spartano was not going to be able to hire a new coach for the 1993–94 season, he agreed to become interim coach. Spartano Aff. ¶ 55; Simpson Aff. ¶ 22. During the 1993–94 academic year, the College conducted a formal search for a new head coach for the women's basketball team and, as a result of that search, Susan Betler was hired as the new coach. Spartano Aff. ¶ 59; Simpson Aff. ¶ 23; Gaal Aff.Ex. J.

The record clearly indicates that the College had legitimate reasons for hiring defendant Spartano to be interim coach of the women's basketball team after plaintiff's contract was not renewed. The record also clearly illustrates that defendants initially attempted to replace plaintiff with a woman coach, but were unsuccessful in doing so. Finally, it is uncontroverted that the College hired a woman, Susan Betler, as plaintiff's permanent replacement. Accordingly, the circumstances surrounding plaintiff's non-renewal are not sufficient to raise an inference of gender discrimination, and plaintiff has

failed to establish a prima facie case of discriminatory discharge. *See Montana v. First Federal Savings and Loan Assoc. of Rochester,* 869 F.2d 100, 107 (2d Cir.1989) (fact that female plaintiff's duties were assumed by other women did not permit an inference of gender discrimination); *Kuhn v. Philip Morris U.S.A., Inc.,* 814 F.Supp. 450, 453 (E.D.Pa.1993) (sexual discrimination claim failed because female plaintiff was replaced by another female), *aff'd,* 16 F.3d 404 (3d Cir.1993).[8] Therefore, defendants are entitled to summary judgment on this claim.

## EQUAL PAY ACT CLAIM

■ Plaintiff asserts a claim under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1), based on the fact that her salary was less than that of Ed Jones, the male coach of the men's basketball team. The EPA states, in pertinent part,

No employer … shall discriminate … between employees on the basis of sex by paying wages to employees … at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; … or (iv) a differential based on any other factor other than sex. …

29 U.S.C. § 206(d)(1). Therefore, in order to state a prima facie case of wage discrimination under the EPA, plaintiff must establish that: (1) the College pays different wages to her male counterpart; (2) plaintiff and her male counterpart perform equal work on jobs requiring equal skill, effort and responsibility; and (3) the jobs are performed under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 193–96, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Once plaintiff has established a prima facie case, the burden of production shifts to the defen-

dants to show that the difference in wages was a result of one of the exceptions outlined in the EPA. *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 524 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). If defendants satisfy their burden of proving legitimate business reasons for the disparity in salaries, the plaintiff can rebut defendants' explanation by showing that the proffered reasons are merely pretextual. *Christiana v. Metropolitan Life Ins. Co.,* 839 F.Supp. 248, 252–253 (S.D.N.Y.1993).

■ It is undisputed that throughout her three year tenure at the College, plaintiff's salary, for coaching basketball, went from $25,000 in 1990–1991, to $25,765 in 1991–92 and, finally, to $29,916 in 1992–93. The men's basketball coach, Mr. Jones, earned $32,500, $33,475 and $34,814 over that same period of time.[9] Similarly, it is also undisputed that the position of head women's basketball coach required equal skill, effort and responsibility and was performed under similar conditions to that of the job of men's head basketball coach. Accordingly, plaintiff has established a prima facie case under the EPA.

■ The defendants have set forth several reasons for the disparity in salary between plaintiff and Mr. Jones. These reasons include differences in education, experience and length of service with the College. Defendants argue that these are legitimate, non-gender based, reasons for the differences in salary and, therefore, they are entitled to summary judgment.

It is undisputed that, at the time she was hired, plaintiff only possessed a bachelor's degree, Spartano Aff. ¶ 16, while, at the time he was hired, the men's basketball coach possessed both a bachelor's degree in Physical Education and a master's degree in Education. Jones Aff. ¶ 2. Plaintiff argues that the difference in educational backgrounds is not a proper basis for the disparity in sala-

---

**8.** Even if the court were to find that plaintiff had established a prima facie case, this claim would still fail as plaintiff has failed to rebut any of the legitimate reasons set forth by defendants in defense of the Title VII retaliation claim.

**9.** As stated above, the record indicates that plaintiff's starting salary of $25,000 was greater than the $23,000 that Mr. Jones received when he first became head coach in 1987. Not. of Mot.Ex. F. Doc. 1.

ries because a master's degree does not have any "effect on . . . coaching." Pl.Mem. at 18. Defendants have not provided any reasons why this difference in educational backgrounds is grounds for the wage differential.

In regard to the experience issue, the record is clear that Mr. Jones, the men's basketball coach, began his coaching career at the College in 1981, and prior to that time he had had eight years of college coaching experience. Jones Aff. ¶ 2. From 1981 through 1987, Mr. Jones served as an assistant coach on the men's basketball team at the College, which was a Division I team at the time. *Id.* ¶ 3. In 1987, the College dropped from Division I to Division III and hired Mr. Jones as the new head coach of the men's basketball team. *Id.* ¶ 4. He continues to serve in that position today.

While Mr. Jones' coaching background is clear, there is some dispute as to the actual amount of college coaching experience plaintiff had at the time she was hired. Defendants claim that, at the time she was hired, plaintiff had nine years of Division III college and junior college coaching experience. Def. 7.1(f) ¶ 4. Plaintiff, on the other hand, claims that, at the time of her hiring by the College, she had "been coaching for 15 years, 13 years as head coach." Complaint ¶ 19. At her deposition, however, plaintiff admitted that these figures included both high school and college coaching experience. Harker Dep. at 62. As for her college coaching experience, plaintiff stated that she had been an assistant for two years, was head coach at a junior college for "approximately four or five" years and head coach in Division III for six years prior to taking the Utica job. *Id.*

While there may be some questions about plaintiff's prior college coaching experience, there is no dispute as to the difference between plaintiff and Mr. Jones in regard to their length of service with Utica College. Prior to her hiring in 1990, plaintiff had no connection with the College. Conversely, Mr. Jones had been employed by the College for six years as an assistant coach before being hired as head coach in 1987. Therefore, by the time plaintiff was hired by the College, Mr. Jones had already been coaching there for nine years.

■ Defendants contend that as a result of these stated reasons, they have satisfied their burden of showing legitimate, non-gender based, reasons for the disparity in salaries between the male coach of the men's basketball team and plaintiff. In addressing an Equal Pay Act claim, the Supreme Court has stated that the Act "contemplates that a male employee with 20 years' seniority can receive a higher wage than a woman with two years' seniority." *Corning Glass*, 417 U.S. at 204, 94 S.Ct. at 2233. Similarly, the Seventh Circuit has stated that "[e]mployers may prefer and reward experience, believing it makes a more valuable employee, for whatever reason. And it is not [the court's] province to second-guess employers' business judgment." *Fallon v. State of Ill.*, 882 F.2d 1206, 1212 (7th Cir.1989). In the case at bar, the record clearly shows that the male coach had *nine years* seniority over plaintiff at the time that she was hired, therefore, the court finds that the defendants have established a legitimate reason for the wage differences between them.[10]

10. Plaintiff also argues that the defendants have violated the Equal Pay Act by providing the coach of the men's team, Mr. Jones, greater benefits than those given to her. Specifically, plaintiff points to the fact that Mr. Jones received an automobile allowance and partial subsidies for insurance and maintenance costs, while she did not receive similar benefits. In response to this claim, the defendants have produced legitimate, non gender-based, business reasons for providing these benefits to Mr. Jones.

The main reason for providing Mr. Jones with these additional automobile related benefits was that the College determined it to be the most cost-effective way to reimburse him for his recruiting expenses. Simpson Aff. ¶ 8. In light of

the fact that Mr. Jones travels between 14,000 and 15,000 miles per year on recruiting trips, the school and Mr. Jones determined that this type of reimbursement plan would be more effective than a per mile plan. *Id.* ¶ 9, Jones Aff. ¶ 8. Because the plaintiff had not shown any need for such an arrangement, the College provided her with use of a College-owned vehicle and reimbursed her on a per mile basis for use of her own car. Simpson Aff. ¶ 10. Indeed, as stated above, plaintiff has admitted that she never requested that she be given a similar arrangement as that given to Mr. Jones. Harker Dep. at 34–35, 54.

Therefore, in assessing the economic implications of these options, it is obvious that the College had a legitimate, non gender-based, rea-

■ Plaintiff has failed to set forth any arguments which could serve to rebut the reasons established by defendants for the differences in pay. Plaintiff states that "according to law, it is the job that must be substantially equal to qualify for equal pay, not the qualifications of the male and female employees." Pl.Memo. at 17–18. This statement is correct only to the extent that, as stated above, the job must be substantially equal in order for plaintiff to establish a prima facie case. Once such a case has been established, however, defendants are entitled to use individualized qualifications as legitimate grounds for wage differences provided that such qualifications are not gender based. *See Christiana,* 839 F.Supp. 248 (wage differential not in violation of Equal Pay Act if based on seniority); *Covington v. Southern Ill. Univ.,* 816 F.2d 317 (7th Cir.1987) (education and experience of male professor were non-gender based reasons sufficient to justify wage disparity), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 101 (1987). Defendants' motion for summary judgment is, therefore, granted.

## TITLE IX

■ Plaintiff has also alleged that the defendants violated Title IX by discriminating against her in the terms and conditions of her employment. Title IX provides, in relevant part, that

> No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). The Supreme Court has held that an implied private right of action exists under Title IX. *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In addressing such actions, "courts have interpreted Title IX by looking ... at the caselaw interpreting Title VII." *Yusuf v. Vassar College,* 35 F.3d 709, 714 (2d Cir.1994). Therefore, the court must employ a Title VII discrimination analysis in order to determine whether a cause of action exists under Title IX.

■ In her claim, plaintiff asserts that she suffered discrimination because: (1) she had to raise money to pay for warm-up clothing for her team; (2) the men's baseball team played on campus while the women's softball team had to use off-campus city facilities; (3) the male coaches got to run summer camps while she was not permitted to do so; (4) the women's teams had to share locker rooms while the men's teams did not; and (5) her teams never received any financial support from the booster club.

■ These allegations are sufficient to create an inference of discrimination such that the burden of production would shift to the defendants to articulate non-discriminatory reasons for the allegedly discriminatory terms and conditions. The court will address those proffered reasons seriatim.

### Fundraising

■ Defendants argue that plaintiff has offered no support for the allegation that she suffered discriminatory terms and conditions of employment because she was forced to raise money to purchase warm-up suits for her players while the College paid for the warm-ups for the male teams. The court agrees, and the record supports that the College purchased warm-ups for the men's basketball team and the women's basketball and soccer teams. Spartano Aff. ¶¶ 64–67. Furthermore, in her deposition testimony, plaintiff repeatedly stated that she did not know whether the warm-ups used by other teams were purchased by the College or through independent fund-raising by the teams. Harker Dep. at 88–92.

### Athletic Fields

■ Defendants have provided legitimate reasons for the fact that plaintiff's softball team had to play on a city-owned, off-campus field while the men's baseball team got to play on-campus. The defendants do not contest the fact that the softball field was owned

son for providing Mr. Jones with an automobile allowance while not providing the plaintiff with

the same arrangement.

by the City of Utica and located off-campus, they do, however, point out that the field was adjacent to the College and only 200 yards from the College Athletic Center. Spartano Aff. ¶ 62. Additionally, the record clearly indicates that the softball field, while owned by the City, was maintained by the College and was in superior condition to the on-campus baseball field. *Id.;* Harker Dep. at 82–83.

### Summer Camps

 Plaintiff also alleges that she received inequitable treatment because she was forced to run a girls' basketball camp in conjunction with Mr. Jones, the coach of the men's team.[11] She argues that she was discriminated against because she was not permitted to run her own girls' camp, and she was not allowed to be present at the boys' camp. Complaint ¶ 25. This argument is weakened, however, by the fact that plaintiff admitted at her deposition that she had never been told that she could not work at the boys' camp, but only that she had never been invited to do so. Harker Dep. at 95. Additionally, plaintiff asserts that she was told that if she wanted to run a girls' basketball camp, she would have to run it with Mr. Jones.[12] Harker Dep. at 93. Defendants deny that plaintiff was ever told that she could not run her own camp, and plaintiff failed to identify who it was who told her so. *Id.;* Spartano Aff. ¶¶ 82–83. Drawing all possible inferences in her favor, the court assumes that plaintiff was told that she had to run the girls' camp in conjunction with Mr. Jones. Nevertheless, such an allegation, standing alone, does not constitute an act of discrimination sufficient to defeat defendants' motion for summary judgment.

### Locker Rooms

 Defendants have set forth legitimate reasons to rebut the allegations of discriminatory terms and conditions of employment resulting from the shared locker rooms. De-

fendants state that the only reason that the women's teams had to share the two locker rooms was because all four teams wanted to use them, while only two of the men's teams wanted to use the two men's locker rooms. Spartano Aff. ¶ 68.

### Booster Club Funds

 The record belies plaintiff's allegation that she was discriminated against by the fact that her teams never received any booster club money. In fact, the record contains copies of at least ten vouchers denoting disbursement of over $7,000 to the plaintiff from the booster club. Gaal Reply Aff.Ex. K. These disbursements covered everything from clothing for the women's basketball and softball teams to spring training softball trips to Myrtle Beach, South Carolina. *Id.*

As stated above, defendants have satisfied their burden of production by articulating legitimate reasons for all of the terms and conditions of employment which plaintiff has claimed to be discriminatory. Plaintiff has failed to direct the court to anything in the record which would serve to rebut these reasons, or create a question of material fact as to any of them. *Woroski,* 31 F.3d 108–09. Accordingly, defendants are entitled to summary judgment on plaintiff's Title IX claim.

### CONCLUSION

In light of the above, the court finds that defendants have produced evidence sufficient to show that the non-renewal of plaintiff's contract was the result of legitimate, non-discriminatory reasons. Additionally, the court finds that plaintiff has failed to create any question as to the credence of the stated non-discriminatory reasons. Therefore, defendants are entitled to summary judgment on all plaintiff's claims.

Accordingly, it is hereby

---

**11.** The summer camps were not run by the College, rather they were independently run by the coaches. Each coach was responsible for paying the College for the use of its facilities and equipment, as well as for hiring and paying instructors. Spartano Aff. ¶ 75.

**12.** The record indicates that the reason that plaintiff and Mr. Jones ran the camp together was that Mr. Jones had been running the camp in the summers prior to plaintiff's hiring. Spartano Aff. ¶¶ 81–82; Harker Dep. at 93.

ORDERED, that defendants' motion for summary judgment is GRANTED, and plaintiff's claims are DISMISSED.

**IT IS SO ORDERED.**