Elizabeth NOYER, Plaintiff,

v.

VIACOM INC., MTV Networks, Nickelodeon, and Kenneth B. Lerer, Defendants.

No. 97 Civ. 6989(JSR).

United States District Court, S.D. New York.

Nov. 5, 1998.

Edward J.M. Little, New York City, for Plaintiff.

Leslie Gordon Fagen , New York City, Stuart Baskin, New York City, for Defendants.

*MEMORANDUM ORDER*

RAKOFF, District Judge.

Employment discrimination cases now compose a material portion of the federal docket. While the Courts of Appeals grapple with the questions of law these cases sometimes present, *see, e.g., Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (*en banc*), the District Courts' biggest job, it seems, is to separate the colorable cases from those that cannot survive summary judgment. This typically turns, not so much on legal niceties, as on a close scrutiny of the specific facts of record. The instant case, in which the Court grants summary judgment, and the roughly similar case of *Smith v. Alexander & Alexander,* No. 97 Civ. 6319 (S.D.N.Y. November 3, 1998), in which the Court recently denied summary judgment, collectively illustrate the point.

Defendant Nickelodeon is one of several programming services that make up defendant MTV Networks, a wholly-owned subsidiary of defendant Viacom, Inc. Two-thirds of Nickelodeon's employees and nearly half of its top executives are women. Nearly all of the top executives have children, and many have taken maternity or paternity leave at company expense.

Plaintiff Elizabeth Noyer, the former Senior Vice President of Communications at Nickelodeon, had just returned from such leave when she resigned, claiming her job responsibilities had been significantly reduced. There followed this lawsuit, in which plaintiff contends that Nickelodeon and its corporate parents intentionally discriminated against her on account of her gender, her marital status, and her pregnancy, violated her rights under the Family and Medical

Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and breached their obligations to her under her employment contract. She also contends that a fourth defendant, Kenneth B. Lerer, tortiously interfered with that contract.[1]

Following discovery, all defendants timely moved for summary judgment. On May 28, 1998, the Court telephonically advised the parties that defendants' motions would be granted. This memorandum will serve to formally confirm that determination and briefly state the reasons therefor.

The pertinent facts, either undisputed or taken most favorably to plaintiff, are as follows:

Prior to assuming her duties as Nickelodeon's Senior Vice President of Communications in April 1994, plaintiff had held public relations jobs with various other firms and companies including a stint with the public relations consulting firm run by defendant Lerer. Lerer and his firm, in turn, had a longstanding relationship with Nickelodeon, MTV Networks, and Viacom. It was Lerer who suggested that Nickelodeon create the post of Senior Vice President of Communications and who recommended that plaintiff, then working at ABC, be hired for the job.

Upon assuming her duties at Nickelodeon, plaintiff received a written "Job Description," which described her primary responsibilities as developing and executing a Nickelodeon communications strategy, providing public relations insight into Nickelodeon's business decisions, and managing Nickelodeon's use of outside suppliers and consultants in the public relations area. In April 1995, plaintiff signed a written contract with MTV Networks that provided that plaintiff would be Senior Vice President of Communications at Nickelodeon and perform "such duties," as well performing "such other duties reasonable and consistent with such office as may be assigned to [her] from time to time." *See* Aff. of Edward J.M. Little in Opp'n to Defs.' Mots. for Summ. J. ("Little Aff."), Ex. 17. Although the contract contained a merger clause, "such duties" was not otherwise defined; but plaintiff alleges that she was told when she signed it that "such duties" referred to the duties enumerated in the pre-existing Job Description. The contract further provided that plaintiff could terminate her contract for "good reason," defined as "the assignment to you by MTVN or Viacom of duties substantially inconsistent with your positions, duties, responsibilities, titles or offices, the withdrawal of a material part of your responsibilities as set forth in [plaintiff's agreement to perform 'such duties'], or the breach by MTVN of any of its material obligations hereunder." *See* Little Aff., Ex. 17.

Although Lerer had recommended her for the job at Nickelodeon, plaintiff, shortly after assuming her position there, complained about the adequacy of Lerer's services to Nickelodeon and the amount of his bills. Thereafter, the Nickelodeon "Executive Team," of which plaintiff was a member, decided to reduce the use of outside consultants, including Lerer, to the maximum extent possible—dubbing 1995 the "Year of No Consultants." As a result, Lerer's 1993 agreement with Nickelodeon, pursuant to which he had received a monthly retainer of $25,000, was terminated, although he continued to do consulting work for Nickelodeon on a piecework basis.

From April 1994 through the end of 1995, plaintiff performed her job to Nickelodeon's complete satisfaction and received one of the two highest bonuses given by the network at year-end 1995. In December 1995, the President of Nickelodeon, Geraldine Laybourne, who had hired plaintiff, announced that she would shortly be leaving. She was replaced as President by Herbert Scannell in early February 1996. Scannell, who had previously expressed misgivings about decreasing Lerer's role, met with Lerer for breakfast two days before becoming President, although neither recalls exactly what they discussed. Thereafter, in April 1996, Scannell told plaintiff that he wanted her to rehabilitate her relationship with Lerer. Plaintiff

---

1. Plaintiff voluntarily dismissed two other claims, *viz*, a defamation claim against defendant Lerer, *see* Stipulation and Order, April 3, 1998, and a claim of civil conspiracy against various defendants, *see* transcript of oral argument on the summary judgment motions, May 7, 1998, at 68–69, 102.

accordingly arranged a breakfast meeting with Lerer, at which Lerer asked plaintiff (who was then seven months pregnant) about her plans for maternity leave. Although the two hugged at the end of the meeting, plaintiff subsequently testified that she found his inquiry suspect.

Plaintiff went on paid maternity leave at the beginning of June 1996. She was told both by Scannell and by Marva Smalls, Nickelodeon's Senior Vice President of Administration and Public Affairs, that she could take as much time as she needed. Although plaintiff named a female subordinate, Piper Parry, as acting Senior Vice President for Communications in plaintiff's absence, plaintiff voluntarily continued to work from home on a variety of projects. Nonetheless, plaintiff alleges, rumors surfaced that she did not plan to return to work, and she had to reassure a number of people that she was intending to return at the end of the summer.

During plaintiff's absence, Scannell, with the encouragement of his superior, Thomas Freston, Chairman and CEO of MTV Networks, began to use Lerer's firm once again for certain work that plaintiff had brought inhouse. Although a new Lerer retainer agreement (for $10,000 a month), dated July 24, 1994, was apparently never executed, Lerer's bills to Nickelodeon increased somewhat from a range of $5,000 to $6,500 in the immediately preceding months to a range of $7,000 to $9,000 in the months of August through October 1996. Scannell kept plaintiff apprised of these developments, but only in general terms.

Also during plaintiff's absence, Freston suggested to Scannell that he take advantage of Lerer's press contacts so as to get a story about Nickelodeon's high ratings "planted" in the *Wall Street Journal.* Although plaintiff disapproved of the idea, Lerer went ahead with preparations, but in the end the paper did not "bite" and the story did not run.

In August 1996, Scannell convened a general meeting on communications strategy. Lerer was invited to attend, but did not. Ms. Parry, plaintiff's temporary replacement, was also invited, but plaintiff herself was not. (Scannell testified that this was because he was respecting the fact that plaintiff was on leave; plaintiff asserts that she was invited to other meetings during the summer). Plaintiff nonetheless invited herself to the meeting. At the meeting, plaintiff's department was asked to supply information to Lerer's employees as needed.

After a four-month leave, plaintiff returned to Nickelodeon full-time on October 1, 1996. She resumed the same title, salary, benefits, office, and duty to report to the President that she had when she left. In her first Executive Team meeting back on the job, plaintiff expressed concern over the way she believed her staff had been treated while she was away. After the meeting, Scannell scolded plaintiff for the tone of her remarks.

Around the same time that plaintiff returned to the office, a contractual dispute arose between the defendants and B Sky B, a United Kingdom satellite distributor that had various, and to some degree conflicting, relations with Nickelodeon, MTV Networks, and Viacom. Because there was some possibility that the dispute might degenerate into litigation, Freston suggested to Scannell and Carole Robinson, Senior Vice President of Communications for MTV Networks, that they solicit Lerer's insight on potential public relations strategies. Early in the week of October 14, plaintiff attended a meeting on the B Sky B issue with, among others, Jeffrey Dunn, COO of Nickelodeon, and Jon Miller, President of Nickelodeon International. Miller told plaintiff something along the lines of "Lerer's calling the shots on this" and "you're getting screwed." When plaintiff got upset, Dunn spoke to plaintiff separately and, after noting that "you're tired of being the other woman," asked plaintiff to "wrap her brain around" the issue.

On October 16, Freston, Lerer, and Scannell were on the same plane to Los Angeles and discussed the B Sky B issue. Lerer mentioned that he knew that a reporter at *Newsweek* was already working on a general story about the owner of B Sky B. Freston asked Lerer to "leak" information about the defendants' disputes with B Sky B to that reporter, apparently in the hope that defendants could thereby cast a favorable "spin" on any publicity about the disputes.

Later that day, plaintiff participated in a conference call with Lerer and Scannell to discuss the B Sky B issue, but no one mentioned Freston's directive and Lerer expressed the opinion that Viacom should steer clear of the issue in the media. Two days later, on October 18, Scannell, Lerer, and plaintiff held another telephonic conference to discuss the B Sky B issue and the *Newsweek* leak was still not mentioned. Shortly after the conference, however, plaintiff was informed by Susan Duffy, a Viacom communications executive, that Lerer had leaked the story to *Newsweek*. Plaintiff, joined by Dunn, went to Scannell's office to inform Scannell of the leak. Scannell then revealed that he already knew about the leak. Plaintiff, believing she had been purposely kept out of the loop, told Scannell "Fuck you," that he had taken her job away from her, and that she was quitting. She then left the building. Four days later, she notified MTV Networks that she was terminating her contract for "good reason."

Against this factual background, the Court considers the plaintiff's various claims:

*1. Gender and Pregnancy Discrimination.* With respect to plaintiff's claims that she was the victim of discrimination on account of gender and/or pregnancy,[2] plaintiff fails to make a showing from which a reasonable fact-finder could conclude that she suffered an adverse employment action or that, assuming such an action took place, it was based in any way on her gender or pregnancy. *See generally Fisher,* 114 F.3d at 1339; *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995).

 The adverse actions that plaintiff alleges in this regard are (i) constructive discharge, and (ii) a material change in the terms and conditions of her employment. As to the former, "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions

that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 361 (2d Cir.1993) (citation omitted). Here, it is undisputed that plaintiff's salary, position, benefits, and basic tasks remained unchanged after she returned from work and that, both before and after her leave, she had never had a single discriminatory comment directed at her. By all accounts, including her own, she resigned, very shortly after her return, in anger brought on by her perception of her superiors' increasing use of an outside consultant she particularly disliked and their failure to inform her of a decision that allegedly involved her area of expertise. No reasonable fact-finder could infer from this that her resignation was compelled by discrimination. *See Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983); *Sanderson v. City of New York,* 1998 WL 187834, at *5–6 (S.D.N.Y.1998).

Nor could a reasonable fact-finder find that plaintiff suffered an adverse change in the terms and conditions of her employment. It is true that the discrimination laws do not "define adverse employment action solely in terms of job termination or reduced wages and benefits, and ... less flagrant reprisals by employers may indeed be adverse." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997). However, "[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse,'" *id.* at 466, keeping in mind that "a transfer or reassignment involving no loss of pay and only minor changes in working conditions will generally not constitute an adverse job action," *Renaldi v. Manufacturers & Traders Trust Co.,* 954 F.Supp. 614, 618 (W.D.N.Y.1997). Here, plaintiff was never transferred, demoted, deprived of perquisites, or subjected to a decrease in pay. To be sure, in her absence on maternity leave her employer delegated some of her responsibilities to Lerer, the experienced outside consultant, rather than to plaintiff's

---

**2.** Plaintiff's claims of discrimination brought under New York Executive Law § 296 and New York City Administrative Code § 8–107 are governed by the same substantive principles as gov-

ern her Title VII claim. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 4 (2d Cir.1995); *Garrison v. Bloomberg,* 1998 WL 30271, at *2 n. 2 (S.D.N.Y.1998).

less-experienced, temporary, in-house replacement. But this lawful exercise of the employer's discretion can neither legally nor factually be said to constitute an adverse action against the absent plaintiff.

Plaintiff contends, however, that the allotment of certain jobs to Lerer during the period of her leave was simply preparatory to depriving her of some of her duties after she returned from leave. Still, in terms of admissible evidence of material events, she relies on but a single incident following her return to support this thesis: the B Sky B incident. The undisputed facts of record prove that this incident in no way diminished her duties and responsibilities at Nickelodeon, because the decision to use Lerer, and to leak the dispute to *Newsweek,* was made by the MTV Networks Chairman, Freston, who had "routinely used Mr. Lerer" and who plaintiff admits had no duty to consult with her at all. *See* Dep. Test. Filed in Supp. of Def. Kenneth Lerer's Mot. for Summ. J., Ex. E at 203–204, 215–217. Nor was Scannell under any duty to inform plaintiff of Freston's decision. Accordingly, even assuming *arguendo* that his failure to so inform plaintiff was deliberate, rather than simply the result of the confusion created by the informal way in which Freston gave Lerer the direction on board a plane, such non-disclosure to a Nickelodeon employee of confidential decisions taken by the highest MTV Networks executive regarding MTV Networks' corporate strategy does not constitute a "negative" alteration of the terms and conditions of her Nickelodeon-related employment. *See de la Cruz v. New York City Human Resources Administration Dep't of Social Servs.,* 82 F.3d 16, 21 (2d Cir.1996).

■ Going still further, even if one were to assume that Scannell was engaged in a secret campaign to divert plaintiff's responsibilities to Lerer, there is no material admissible evidence in the record presented to the Court from which a reasonable fact-finder could infer that Scannell, or the defendants, were motivated by discrimination. The rumors that allegedly circulated during plaintiff's maternity leave to the effect that she might not return—which, to judge from the admissible evidence, were more in the nature of speculations than assertions—have not been connected to Scannell nor, indeed, to anyone with any authority in the company except arguably Ms. Smalls. Nor have they been causally linked to anything that took place after plaintiff's return.

Plaintiff's other alleged bases for imputing bias to Scannell are even more attenuated and hardly merit discussion. To give just one example, plaintiff argues that it is reasonable to infer gender bias from the fact that Scannell, in his deposition, described plaintiff's conduct at the time of her abrupt verbal resignation on October 18 as "hysterical" and a "tantrum"—which plaintiff labels as "code language" for gender bias. *See* Exs. to Little Aff., Scannell Dep. at 235–236; Mem. of Law in Opp. to Defs' Mots. for Summ J. at 43. But given plaintiff's own description of her intense anger and use of obscenities at the time, no reasonable juror could infer gender bias from such use of ordinary English words in their ordinary descriptive meanings.

By contrast, the record is replete with evidence that discriminatory animus played no role in Scannell's actions and that any such action adverse to plaintiff was the result of the reasonable exercise of business judgment or, at worst, "institutional politics ... or personal hostility." *Fisher,* 114 F.3d at 1337. Scannell had long supported the use of outside consultants, and of Lerer in particular, to perform sensitive public relations tasks, and this view of proper allocation of responsibilities was shared by Scannell's immediate boss, Freston, who instructed Scannell to consult Lerer on a number of matters. From a more personal standpoint, Scannell's maintaining a good relationship with Lerer was, by plaintiff's own admission, "vital" to Scannell's own professional success because of the great influence Lerer wielded with Freston and others even higher in the MTV–Viacom hierarchy. Scannell also had a strong motive to dislike plaintiff since plaintiff had unsuccessfully backed another candidate over Scannell as Laybourne's replacement. Thus, in contrast to plaintiff's unsupported claims of bias, defendants have adduced substantial evidence of both business and

personal (but non-discriminatory) justifications for Scannell's allegedly adverse actions. *See Harris v. New York City Dep't of Homeless Servs. Eligibility Investigation Unit,* 1998 WL 205334, at *7 (S.D.N.Y. 1998). *Cf. Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987).

Finally, as previously mentioned, Nickelodeon has, and had at all times here relevant, an overall employee composition and record of non-discrimination that strongly negatives any claim of a climate of discrimination. *See Morrissey v. Symbol Technologies, Inc.,* 910 F.Supp. 117, 121 (E.D.N.Y.1996). Indeed, after plaintiff quit, she was first replaced on an interim basis by Carole Robinson, a woman who herself had just returned from maternity leave, and then on a permanent basis by Mary Neagoy, also a married woman. If defendants were motivated as plaintiff claims by animus against women or pregnant women or mothers, rather than by a desire to utilize Lerer more frequently regardless of Lerer's gender, they would not have been likely to replace someone in plaintiff's high position with members of the very same protected classes they allegedly discriminate against. *See Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 107 (2d Cir.1989); *Smith v. Madison Square Garden,* 1997 WL 151406, at *4 (S.D.N.Y.1997); *Duprey v. Prudential Insurance Co. of Am.,* 910 F.Supp. 879, 887 (N.D.N.Y.1996); *Harker v. Utica College of Syracuse Univ.,* 885 F.Supp. 378, 388–89 (N.D.N.Y.1995).

In short, even after taking every inference most favorable to plaintiff, there is simply nothing here on which a reasonable factfinder could ground a finding of gender or pregnancy discrimination. *See generally Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir. 1997); *Coraggio v. Time Inc. Magazine Co.,* 1996 WL 139786, at *7 (S.D.N.Y.1996), *aff'd,* 108 F.3d 329 (2d Cir.1997). The federal claims of gender and pregnancy discrimination must therefore be dismissed, and the Court, exercising its discretion under 28 U.S.C. § 1367(c) to retain supplemental juris-

diction over plaintiff's parallel state law claims of gender and pregnancy discrimination, likewise dismisses them on the identical grounds. *See Richardson v. Newburgh Enlarged City School Dist.,* 984 F.Supp. 735, 747 (S.D.N.Y.1997).

■ *2. Marital Status Discrimination.* For essentially the same reasons already discussed, plaintiff's claims of marital status discrimination must also be dismissed.[3] Scannell himself was married, as were most other Nickelodeon executives who figure in plaintiff's allegations; and by plaintiff's own admission, no one ever made a negative comment to her about her marital status.

Plaintiff, indeed, came close to abandoning this claim at her deposition, giving the following testimony:

Q: What is the factual basis for your claim in the complaint that you were a victim of marital discrimination, discrimination by virtue of marriage?

A: Well, I was married at the time I was having my child and at the time that I was working at the company. When I left for my maternity leave, it was at that time.

Q: Can you think of any other factual basis for your claim that you were the victim of discrimination by virtue of being married?

A: At this time, I can't. I can't.

Noyer Dep. at 5. Other than this, plaintiff's entire basis for this claim appears to rest on the allegation that while plaintiff was on leave Marva Smalls told Tory Johnson, Director of Communications at Nickelodeon, what Johnson paraphrases as something like "[plaintiff] has a new wealthy husband, a new home in Long Island and a new baby ... [and] doesn't need the money so why in the world would she come back." Johnson Aff. ¶ 10. Even assuming that Smalls' stray speculation could somehow be viewed as discrimination, it has no discernable connection whatever to any adverse employment action that plaintiff claims to have suffered.

---

**3.** Although plaintiff's claims of marital discrimination are brought only under New York State and City law and the Court is dismissing all of plaintiff's federal claims on the merits, the Court also exercises its discretion to retain jurisdiction over the marital discrimination claims because they are closely related to plaintiff's other discrimination claims.

*3. FMLA Claim.* The Family and Medical Leave Act provides that an eligible employee shall be entitled, in connection with the birth of a child, to a total of twelve workweeks of leave during any 12–month period. 29 U.S.C. § 2612(a)(1). On return from FMLA leave, an employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to be restored to "an equivalent position with equivalent ... terms and conditions of employment." 29 U.S.C. § 2614(a)(1). While the accompanying regulation, 29 C.F.R. § 825.215, goes farther, stating that an "equivalent position" is one that is "virtually identical" to the old position "in terms of pay, benefits and working conditions, including privileges, perquisites and status" and that it "must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority," even the regulation states that the requirement "does not extend to de minimis or intangible, unmeasurable aspects of the job." Moreover, under the statute itself, an employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(b).

While defendants raise substantial questions as to the application of the FMLA to plaintiff's particular situation, the Court need not reach these issues since the Court has already effectively concluded, for the reasons stated above, that no reasonable fact-finder could view any changes plaintiff experienced after she returned to work as anything more than "intangible" or "de minimis" departures from her pre-leave job. Specifically, as already discussed, the sole supported incident that occurred after plaintiff's return that even arguably bespeaks change was the B Sky B incident. But as already demonstrated, this incident, by plaintiff's own admission, involved decisions outside her purview made by Freston, whom plaintiff neither served nor reported to. *See* Little Aff., Ex. 14; *Taylor v. Cameron Coca–Cola Bottling Co., Inc.,* 1997 WL 719106, at *20–21 (W.D.Pa. 1997). While plaintiff focuses heavily on the notion that she was marginalized because she was asked to work on the B Sky B project without being kept fully informed of everything that was going on, she had, as already discussed, no job entitlement to such disclosure. Plaintiff in effect is demanding a right that she would not have been entitled to prior to her leave had the B Sky B issue arisen at that time. This cannot support a FMLA claim.

■ *4. State Law Breach of Contract and Tortious Interference Claims.* While the Complaint also alleges state law claims of breach of contract and tortious interference with contract, considerations of comity and judicial economy make it inappropriate for the Court to retain jurisdiction over these non-discrimination claims once the federal claims are dismissed on the merits. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Morse v. Univ. of Vermont,* 973 F.2d 122, 128 (2d Cir.1992).

In conclusion, while one cannot read plaintiff's submissions without recognizing that she feels ill-used, it is an ill use of federal discrimination laws to treat them as sharpening stones on which to grind personal axes. Accordingly, for the foregoing reasons, defendants' motions for summary judgment are granted. All of plaintiff's federal law claims and her state law claims of gender, pregnancy, and marital discrimination are dismissed with prejudice, and plaintiff's state law claims of breach of contract and tortious interference with contract are dismissed without prejudice. Clerk to enter judgment.

SO ORDERED.